[No. S058721. Aug. 31, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
SCOTT BREVERMAN, Defendant and Appellant.

**COUNSEL**

Marcia A. Morrissey for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General,

Pamela C. Hamanaka, Jaime L. Fuster, Sharon Wooden Richard, William T. Harter and Margaret E. Maxwell, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BAXTER, J.**—Two young men who were walking by defendant's house got into a fight with a larger group of youths congregated in the driveway. The two sustained cuts and bruises before the fracas ended and they were allowed to leave. The next night, at least one of the pair returned with a group of friends to exact some sort of retaliation. Members of the group taunted defendant, then used a baseball bat and other implements to batter his automobile, which was parked in the driveway near his front door. Defendant fired several shots through a window pane in the front door, then came outside and fired further shots toward the fleeing vandals. One bullet from this second volley fatally wounded a member of the group.

Defendant was charged with murder. The jury also received instructions on justifiable homicide ("reasonable" self-defense) and on the lesser "necessarily included" offenses of voluntary and involuntary manslaughter. The voluntary manslaughter instructions were premised entirely on the theory of "unreasonable" self-defense. (See *People* v. *Flannel* (1979) 25 Cal.3d 668, 674-680 [160 Cal.Rptr. 84, 603 P.2d 1] (*Flannel*).)

Defendant appealed his murder conviction, urging, inter alia, that the trial court erred by failing to instruct, sua sponte, on a "heat of passion" theory of voluntary manslaughter (see Pen. Code, § 192, subd. (a) (section 192(a))[1] which was also supported by the evidence. The Court of Appeal agreed. It further found the error prejudicial under *People* v. *Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913] (*Sedeno*), because the jury had not necessarily resolved, in another context, the issue posed by the omitted instruction. The Court of Appeal therefore reversed the conviction.

We granted review to consider two issues: First, does the sua sponte duty to instruct on lesser necessarily included offenses (*Sedeno, supra,* 10 Cal.3d 703, 715-716) extend to every theory of such an offense that finds rational support in the evidence? Second, what standard of appellate reversal should apply to an erroneous failure to instruct, or to instruct completely, on a lesser included offense?

We now reach the following conclusions: California law requires a trial court, sua sponte, to instruct fully on all lesser necessarily included offenses

---

[1] All further unlabeled statutory references are to the Penal Code.

supported by the evidence. The Court of Appeal correctly ruled that in a murder prosecution, this includes the obligation to instruct on every supportable theory of the lesser included offense of voluntary manslaughter, not merely the theory or theories which have the strongest evidentiary support, or on which the defendant has openly relied. Here, there was substantial evidence to support a heat of passion theory of voluntary manslaughter, and the instant trial court should therefore have instructed on this theory.

However, we further conclude, the *Sedeno* standard of near-automatic reversal for this form of error should be abrogated. The sua sponte duty to instruct fully on all lesser included offenses suggested by the evidence arises from California law alone. Moreover, a failure to fulfill this duty is not a structural defect in the proceedings, but mere misdirection of the jury, a form of trial error committed in the presentation of the case. Hence, by virtue of the California Constitution, reversal is not warranted unless an examination of "the entire cause, including the evidence," discloses that the error produced a "miscarriage of justice." (Cal. Const., art. VI, § 13.) This test is not met unless it appears "reasonably probable" the defendant would have achieved a more favorable result had the error not occurred. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] (*Watson*).)

Because the Court of Appeal applied the *Sedeno* standard we now overrule, and therefore reversed defendant's murder conviction without determining from the entire record whether there was a reasonable probability the error affected the outcome, the Court of Appeal's judgment must be reversed. Under the circumstances, we will remand the cause to the Court of Appeal for an evaluation of prejudice under *Watson*. If the Court of Appeal concludes the error was harmless by that standard, it should proceed to consider the numerous other claims raised by defendant on appeal.

FACTS AND PROCEDURAL BACKGROUND

Defendant was charged by information with the murder of Andreas Suryaatmadja. (§ 187, subd. (a).)[2] The information also alleged a firearm use enhancement. (§ 12022, subd. (a).)

Insofar as pertinent here, the prosecution evidence was as follows:

On the evening of December 17, 1993, Yoon Ju and Hyun (Bill) Kim were walking in Chatsworth on their way to play pool. As they passed defendant's residence at 21747 Hiawatha Street, words were exchanged with a larger

---

[2]The information alleged generally that defendant "did willfully, unlawfully, and with malice aforethought murder Andreas Suryaatmadja, a human being."

group of young people who were drinking beer in the garage and driveway area. A fight ensued. Ju and Kim were kicked and beaten, and they received minor injuries. Kim testified defendant was present at the fight but stayed in the background.

Between 8 and 10 p.m. the next evening, December 18, Kim and six to ten friends, including victim Suryaatmadja, returned to defendant's neighborhood. The group was riding in two cars, a gray Nissan and a black Honda. The aim was to have an even fight with those who had beaten Kim and Ju the night before. The group parked around the corner from defendant's residence. Kim had a fishing knife, and the group was armed with other weapons, including a baseball bat and parts of a "Club" automobile security device.

Kim first approached the residence alone. When it appeared nobody was home, Kim slashed a tire of a BMW automobile parked in defendant's driveway and walked back to his waiting friends. As Kim did so, defendant came out of the house and checked the BMW. Some of Kim's friends yelled to defendant to bring out his friends for an even fight. Defendant saw the group and went back inside.

The group then drove by a back route, parked up the street on the other side of defendant's house, and began walking toward defendant's residence. Suryaatmadja and another person may have hung back at an intersection. Once the main group arrived in front of defendant's house, four or five individuals came up to the BMW and began hitting the car with the bat, the Club pieces, and a broken broomstick. The group may have been shouting epithets. Suryaatmadja was not in the group that hit the car.

The BMW's alarm went off, and moments later, shots came from the front door of defendant's residence. The shots continued as the group began to run away. During the second of two separate volleys, Kim looked back and saw defendant firing from his driveway near the public sidewalk. When the gunfire stopped, Suryaatmadja was lying in the street, unconscious and bleeding from the head. He died at a hospital several hours later. The cause of death was a bullet that entered the right rear of the victim's head and exited above his right eye.

Defendant told a responding police officer that he fired at "armed" Asians who were "beating on his car, vandalizing his car," and that he feared the people would come into his house. The officer saw two metal rods or pipes in the street.

In a tape-recorded police interview, defendant stated as follows:[3] During the fight of December 17, he was inside the house, sick and asleep. On the evening of December 18, as he entered his car to go to the market, a group of unknown men came toward him, yelling. He reactivated his car alarm, ran back inside, told his mother to call 911, but then wondered if he was being too "paranoid." Nothing happened for five minutes. Defendant and a friend, Kyle Beck, then peered over the back fence. They did not observe anybody in the area where the group had previously been spotted, but when defendant turned his gaze, he saw the group approaching again from the opposite direction, still yelling. Defendant ran back inside to tell his mother "they're coming." He then heard the alarm go off as they began "bashing" his car. Defendant saw at least 12 people, and they were "mobbing[,] basically." He broke the glass in the front door and fired three or four rounds "kind of . . . like downward." The intruders stopped hitting his car, but defendant came outside and shot six or seven more times as the group fled. He was not "aiming" and did not intend to hit anybody.[4] He was "trying to get them to stop" because they had "done a lot of damage to [his] car," and he wanted to "hold [them] until the cops came" so they would be "arrested or whatever." When his semiautomatic weapon, which held 13 rounds, ran out of ammunition, he ran back inside. His mother was already making an emergency call. He locked the door and waited for the police.

Defendant also insisted that when he fired from inside, it looked like the group was "coming at me" and "rushing the door." Defendant declared that he "thought we were going to get killed."

The police recovered four shell casings from inside the house and another ten from the driveway. There was bullet damage to the BMW, and to two vehicles parked in the street, at heights and angles that suggested level firing. One bullet passed through the third story wall of a townhome over a block away. The pool of blood where the victim fell was on Hiawatha Street, 182 feet from where the shell casings in defendant's driveway were found.

The defense case included testimony by Chad Reuser, Kyle Beck, and defendant's mother, Janet Breverman (Janet). Reuser corroborated defendant's claim that he was not present at the fight of December 17. Beck and Janet described events inside defendant's house on the night of December 18.

Beck testified as follows: He and defendant were watching television in defendant's bedroom when defendant left the room, stating he was going to

---

[3]Defendant did not testify at trial. The tape recording of his police interview was played for the jury as part of the prosecution's case-in-chief.

[4]At this point, according to the detective present at the interview, defendant demonstrated that he fired with his arm in a level, locked position, parallel to the ground.

the store to get lozenges for his sore throat. Defendant returned almost immediately, apparently already holding his gun. Defendant said someone should call 911 because "15 to 20 guys," armed with "bats and chains and stuff," had "rushed him" as he tried to get into his car. Beck and defendant looked out the front window, saw a white Honda pass slowly, and feared a drive-by shooting. After a few minutes, the two went outside and looked over a gate; Beck saw "four or five heads." Defendant asked Beck to guard the rear of the house while defendant ran back to the front. Beck then heard smashing sounds that caused him to think the intruders had forced their way in through a window. Within seconds thereafter, Beck heard gunfire.

Janet testified as follows: On the evening of December 18, she was watching television in her room. The chirping of defendant's car alarm indicated he had left the house, then quickly returned. Defendant reported "there were a whole group of Oriental guys" walking toward the house. Defendant, and perhaps Beck, went to check the rear of the house, while Janet went to the bathroom, which was adjacent to the driveway where defendant's car was parked. Just as she exited the bathroom, the car alarm went off, and she heard breaking glass and "blows" to the vehicle. The frequency of blows suggested at least three people were pounding the car. She "dropped to the ground," expecting "things to be coming through the window." She "absolutely" was in "fear." About that time, defendant yelled "call 911," and she crawled into the family room to the telephone. By the time she made the call, shots had been fired.

At the close of the prosecution case, the trial court ruled there was no evidence of premeditation or deliberation, and the verdict would thus be limited to second degree murder. The jury was instructed on both express and implied malice theories of that offense. The court also provided instructions, as agreed by the parties, on reasonable defense of self or others as justifiable homicide, on the permissible use of force to resist a violent domestic intruder, on voluntary manslaughter as an intentional killing arising from an honest but unreasonable belief in the need for self-defense, and on involuntary manslaughter as an unintentional killing by the reckless or grossly negligent commission of a highly dangerous act. Defendant was convicted of murder, and the firearm-use enhancement was found true. The court sentenced defendant to a term of 18 years to life.

On appeal, defendant argued, inter alia, that the court erred by failing, on its own motion, to instruct on a second theory of voluntary manslaughter, an unlawful intentional killing "upon a sudden quarrel or heat of passion." (§ 192(a).) In an opinion by Justice Armstrong, concurred in by Justice Grignon, the Court of Appeal, Second District, Division Five agreed. The

majority reasoned, in essence, that the same evidence of threat and fear of harm which supported a claim of unreasonable self-defense also permitted a manslaughter verdict based on heat of passion. The majority concluded that the instructional error required reversal under *Sedeno, supra,* 10 Cal.3d 703, because the jury had not necessarily resolved the heat of passion issue against defendant in another context.

In a separate concurrence, Presiding Justice Turner urged us to reconsider the scope of the rule requiring sua sponte instructions on lesser included offenses, as well as the circumstances under which this category of error should require reversal. We granted the People's petition for review.

## Discussion

*Duty to instruct on all supportable theories of lesser included offense.*

As below, defendant urges the trial court's voluntary manslaughter instructions were defective because they did not include the heat of passion theory despite support for that theory in the evidence. The omission, defendant suggests, deprived him of his "constitutional right to have the jury determine every material issue presented by the evidence." (*People* v. *Modesto* (1963) 59 Cal.2d 722, 730 [31 Cal.Rptr. 225, 382 P.2d 33] (*Modesto*); see also *People* v. *Wickersham* (1982) 32 Cal.3d 307, 335 [185 Cal.Rptr. 436, 650 P.2d 311] (*Wickersham*).)

The People, on the other hand, argue that the duty to instruct sua sponte on a lesser included offense is satisfied when the court instructs on the theory of that offense most consistent with the evidence and the line of defense pursued at trial. The court, the People urge, need not further provide, in the absence of a defense request, instructions on additional, and perhaps conflicting, theories of the lesser offense. We find defendant's position more persuasive.

"Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of . . . voluntary manslaughter. (§ 192.)" (*People* v. *Barton* (1995) 12 Cal.4th 186, 199 [47 Cal.Rptr.2d 569, 906 P.2d 531] (*Barton*).) Generally, the intent to unlawfully kill constitutes malice. (§ 188; *People* v. *Saille* (1991) 54 Cal.3d 1103, 1113 [2 Cal.Rptr.2d 364, 820 P.2d 588]; see *In re Christian S.* (1994) 7 Cal.4th 768, 778-780 [30 Cal.Rptr.2d 33, 872 P.2d 574] (*Christian S.*).) "But a defendant who intentionally and unlawfully kills lacks malice . . . in limited, explicitly defined circumstances: either when the defendant acts in a

'sudden quarrel or heat of passion' (§ 192, subd. (a)), or when the defendant kills in 'unreasonable self-defense'—the unreasonable but good faith belief in having to act in self-defense (see []*Christian S.*[, *supra*,] 7 Cal.4th 768; []*Flannel, supra,* 25 Cal.3d 668)." (*Barton, supra,* 12 Cal.4th at p. 199.) Because heat of passion and unreasonable self-defense reduce an intentional, unlawful killing from murder to voluntary manslaughter by *negating the element of malice* that *otherwise inheres* in such a homicide (*ibid.*), voluntary manslaughter of these two forms is considered a lesser necessarily included offense of intentional murder (*id.* at pp. 201-202).[5]

■ " 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' (*People* v. *St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390].) ■ That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present (see, e.g., *People* v. *Hood* (1969) 1 Cal.3d 444 [82 Cal.Rptr. 618, 462 P.2d 370]), but not when there is no evidence that the offense was less than that charged. (*People* v. *Noah* (1971) 5 Cal.3d 469, 479 [96 Cal.Rptr. 441, 487 P.2d 1009]; *People* v. *Osuna* (1969) 70 Cal.2d 759, 767 [76 Cal.Rptr. 462, 452 P.2d 678].) The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given. (*People* v. *Mosher* (1969)

---

[5]"Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People* v. *Birks* (1998) 19 Cal.4th 108, 117 [77 Cal.Rptr.2d 848, 960 P.2d 1073] (*Birks*).) Though the question was raised from the bench at oral argument, and is addressed by Justice Mosk, no party here has otherwise argued that voluntary manslaughter "upon a sudden quarrel or heat of passion" (§ 192(a)) is not a necessarily included offense of intentional murder. Defendant did dispute the prosecution's claim that he intended to kill, and defendant received involuntary manslaughter instructions on the theory of an unintentional but grossly negligent killing. However, particularly as originally presented to the Court of Appeal, defendant's appellate argument that he was entitled to an instruction on heat of passion as a form of voluntary manslaughter has assumed that this theory applies only to an intentional killing. We thus have no occasion in this case to decide whether that is invariably so. (But see *Christian S., supra,* 7 Cal.4th at p. 780, fn. 4 [suggesting that unreasonable self-defense may reduce implied malice murder to voluntary manslaughter].) Justice Mosk's reference to the fact that murder, but not manslaughter, may be committed upon a fetus is also irrelevant in this case. This theory, too, has not been raised by the parties. In any event, as Justice Mosk appears to concede, it has no bearing where, as here, the accusatory pleading specifically charged murder *of a human being*. (*Birks, supra,* 19 Cal.4th at p. 117; *People* v. *Marshall* (1957) 48 Cal.2d 394, 405-407 [309 P.2d 456].)

1 Cal.3d 379, 393 [82 Cal.Rptr. 379, 461 P.2d 659]; *People* v. *Graham* (1969) 71 Cal.2d 303, 319 [78 Cal.Rptr. 217, 455 P.2d 153].) Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense. (*People* v. *St. Martin, supra*, 1 Cal.3d 524, 533.)" (*Sedeno, supra*, 10 Cal.3d 703, 715-716, fn. omitted; see *Barton, supra*, 12 Cal.4th at pp. 194-198.)

Cases have suggested that the requirement of sua sponte instructions arises, among other things, from the defendant's right under the California Constitution "to have the jury determine every material issue presented by the evidence." (E.g., *People* v. *Geiger* (1984) 35 Cal.3d 510, 519 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055] (*Geiger*), overruled on other grounds, *Birks, supra*, 19 Cal.4th 108; see also *Wickersham, supra*, 32 Cal.3d 307, 335; *Sedeno, supra*, 10 Cal.3d 703, 720; *Modesto, supra*, 59 Cal.2d 722, 730.) However, we have consistently stressed the broader interests served by the sua sponte instructional rule. As we have said, insofar as the duty to instruct applies regardless of the parties' requests or objections, it prevents the "strategy, ignorance, or mistakes" of *either* party from presenting the jury with an "unwarranted all-or-nothing choice," encourages "a verdict . . . no harsher *or more lenient* than the evidence merits" (*Wickersham, supra*, 32 Cal.3d at p. 324, italics added), and thus protects the jury's "truth-ascertainment function" (*Barton, supra*, 12 Cal.4th 186, 196). "These policies reflect concern [not only] for the rights of persons accused of crimes [but also] for the overall administration of justice." (*Wickersham, supra*, 32 Cal.3d at p. 324.)

We have noted the danger of all-or-nothing verdict choices as a basis for the instructional rule. However, we have never intimated that the rule is satisfied once the jury has *some* lesser offense option, so that the court may limit its sua sponte instructions to those offenses or theories which seem strongest on the evidence, or on which the parties have openly relied. On the contrary, as we have expressly indicated, the rule seeks the most accurate possible judgment by "ensur[ing] that the jury will consider the *full range of possible verdicts*" included in the charge, regardless of the parties' wishes or tactics. (*Wickersham, supra*, 32 Cal.3d 307, 324, italics added.) The inference is that *every* lesser included offense, or theory thereof, which is supported by the evidence must be presented to the jury.

The People effectively concede that the rule they suggest is not consistent with existing law. They argue only that we should "reexamine" the sua

sponte duty to that extent and should impose the proposed limit as a matter of first impression.[6]

We decline to do so. The rule the People advocate would contravene the policies our cases have consistently expressed in support of the existing instructional requirement. The People present no persuasive reason for departing from these well-established principles.

Indeed, in *Barton*, *supra*, 12 Cal.4th 186, we recently considered and rejected a *defendant*'s contention that the sua sponte instructional rule for lesser included offenses should be narrowed in a fashion closely akin to that

---

[6]In dissent, Justice Brown urges at length that the California rule requiring sua sponte instructions on lesser necessarily included offenses should be entirely abrogated in favor of a rule requiring such instructions only on a party's request. However, that broader issue is not before us, because the People themselves have made no such contention. At oral argument, the People's counsel explicitly disclaimed any such purpose. Counsel for the People agreed they seek modification of the rule only to the "limited extent" of specifying that the court's duty to instruct on its own motion does not extend beyond a single theory of a lesser included offense that most conforms to the evidence and the strategies pursued by the parties at trial. Accordingly, in resolving the case before us, we consider only whether the "single theory" corollary advocated by the People is consistent with the established general rule requiring sua sponte instructions on lesser included offenses, not whether the general rule itself should be abolished.

Justice Brown implies that we act inconsistently, because in *Birks* we today overturn the ill-considered rule allowing defendants to demand instructions on lesser *related* offenses (*Birks*, *supra*, 19 Cal.4th 108, overruling to that extent *Geiger*, *supra*, 35 Cal.3d 510; see also fn. 16, *post*), but we decline here to reexamine the sua sponte instructional rule for lesser *included* offenses, a doctrine she deems equally ill-conceived. In *Birks*, however, the issue whether the rule for lesser related offenses should be abrogated was directly and vigorously advanced. It is the principal reason we granted review in *Birks*, and the question received the complete and focused briefing attention of the parties. Hence, in *Birks*, the exceptional circumstances which must justify a decision to overrule settled law were fully explored. No similar situation is presented here. Though several of their arguments imply a general distaste for the sua sponte instructional rule for lesser included offenses (see fn. 9, *post*), the People do not pursue their objections to that end. For the most part, the fundamental constitutional and policy arguments raised by Justice Brown are not addressed in the parties' briefs. In any event, as we note at length both here and in *Birks*, there are logical and significant reasons to follow established California precedent with respect to lesser included offenses while abandoning such precedent in the case of lesser related offenses. (*Ante*, at pp. 154-155; *Birks*, *supra*, 19 Cal.4th at pp. 112, 117-119.)

As Justice Brown observes, we do herein modify the standard by which the *reversibility* of erroneous failures to instruct sua sponte on lesser included offenses has heretofore been determined. (*Post*, at pp. 165-178.) But that is an issue directly raised, and addressed at length, in this court. By concluding that such error must henceforth be examined for its actual effect on the trial outcome, we simply adopt the uniform standard of reversible prejudice applicable to most forms of state law trial error by virtue of the "miscarriage of justice" clause of the California Constitution (art. VI, § 13). Contrary to Justice Brown's assertion, we do not thereby cling to the sua sponte rule on the one hand while denigrating its importance on the other. (See also fn. 25, *post*.)

suggested by the People here. A brief background discussion is necessary to explain the context in which the *Barton* issue arose.

In *Sedeno, supra,* 10 Cal.3d 703, we noted that the sua sponte duty to instruct on all material issues presented by the evidence extends to *defenses* as well as to lesser included *offenses* (*id.* at p. 716), but we drew a sharp distinction between the two situations. In the case of *defenses,* we concluded, a sua sponte instructional duty arises "only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense *and* the defense is not inconsistent with the defendant's theory of the case." (*Ibid.,* italics added.) Thus, when the trial court believes "there is substantial evidence that would support a *defense* inconsistent with that advanced by a defendant, the court should ascertain from the defendant whether he wishes instructions on the alternative theory." (*Id.* at p. 717, fn. 7, italics added.) By contrast, "[w]hen the charged offense is one that is divided into degrees or encompasses lesser *offenses,* and there is evidence from which the jury could conclude that the lesser offense had been committed, the court must instruct *on the alternate theory* even *if it is inconsistent with the defense elected by the defendant . . . ."* (*Ibid.,* italics added.)

*Wickersham* later concluded that the unreasonable self-defense theory of voluntary manslaughter "comes within *Sedeno*'s category of 'defenses' for purposes of the obligation to instruct *sua sponte."* (*Wickersham, supra,* 32 Cal.3d 307, 329.) Hence, *Wickersham* reasoned, sua sponte instructions on that theory, even if supported by the evidence, were not necessary unless consistent with the defendant's trial theory. (*Ibid.*) On the other hand, *Wickersham* confirmed that where the evidence in a murder case would support a heat of passion theory of voluntary manslaughter, "the trial court is obligated to instruct on the theory." (*Id.* at p. 325.)

The instructional distinction between *defenses* and lesser included *offenses* arose again in *Barton, supra,* 12 Cal.4th 186. There, the defendant fatally shot the victim during a heated, parking lot argument. The defendant had extensive military firearms training and was, as usual, legally carrying a semiautomatic pistol. The exact circumstances of the shooting were in substantial dispute. The defendant claimed he saw a knife in the victim's hand, brandished his gun to hold the victim for the police, but then fired reflexively while stepping backward to avoid the victim's threatening movement. The defendant requested the omission of instructions on voluntary manslaughter as a lesser offense included in murder, because such instructions would contravene his theory that he killed accidentally. The trial court denied the request and instructed on both heat of passion and unreasonable self-defense theories of voluntary manslaughter. In their jury arguments, the

prosecution claimed an intentional murder, while defense counsel adhered to the premise of an accidental, and thus excusable, killing.

On appeal from his manslaughter conviction, the defendant urged that we abrogate *Sedeno*'s differing instructional treatment of offenses and defenses, thus allowing him, as in the case of defenses, to veto instructions on lesser included offenses inconsistent with his trial strategy. We declined the invitation. We concluded that *Sedeno*'s reasoning in this respect was sound, and that the rule requiring sua sponte instructions on lesser included *offenses* regardless of the parties' strategies should be retained.

*Barton* explained that "[f]ailure to . . . instruct [on defenses not asserted by the defendant] will not deprive the jury of the opportunity to consider the full range of criminal offenses established by the evidence. Nor is the prosecution denied the opportunity to seek conviction on all offenses included within the crime charged. Moreover, to require trial courts to ferret out all defenses that might possibly be shown by the evidence, even when inconsistent with the defendant's theory at trial, would not only place an undue burden on the trial courts but would also create a potential of prejudice to the defendant. As we said in *Sedeno, supra,* 10 Cal.3d at pages 716-717: ' "Appellate insistence upon *sua sponte* instructions [concerning defenses] which are inconsistent with defense trial theory or not clearly demanded by the evidence would hamper defense attorneys and put trial judges under pressure to glean legal theories and winnow the evidence for remotely tenable and sophistical instructions." ' " (*Barton, supra,* 12 Cal.4th 186, 197.)

On the other hand, *Barton* concluded, "[a] trial court's failure to inform the jury of its option to find the defendant guilty of [a] lesser [included] *offense* [supported by the evidence] would impair the jury's truth-ascertainment function" by forcing the jury "to make an 'all or nothing' choice between conviction of the crime charged or complete acquittal, thereby denying the jury the opportunity to decide whether the defendant is guilty of a lesser included offense established by the evidence." (*Barton, supra,* 12 Cal.4th 186, 196, italics added, fn. omitted.)[7]

*Barton* then analyzed whether heat of passion and unreasonable self-defense, insofar as they reduce a murder to voluntary manslaughter, are mere

---

[7]*Barton* also observed that a rule allowing the defendant to *preclude* instructions on lesser included offenses inconsistent with the defense trial theory "would . . . be unfair to the prosecution," because it would deny the prosecution the opportunity to argue that even if the defendant was not guilty of the charged offenses, he or she was at least guilty of the lesser offense. (12 Cal.4th 186, 196.) The People argue that similar fairness considerations are not presented here, because it was not a defense *objection* that led to the omission of instructions on heat of passion, and *neither party* argued that theory to the jury. This contention is further discussed below.

defenses which the defendant may control under *Sedeno*. *Barton* answered that question in the negative.

We acknowledged in *Barton* that because "it is [ordinarily] the defendant who offers evidence" on these theories, and because they operate to reduce murder to the lesser offense of manslaughter, they resemble traditional affirmative defenses. Mindful of *Wickersham*'s holding on the issue, we also noted in particular the close conceptual similarities between unreasonable self-defense and the "actual" defense of "true" self-defense. (*Barton, supra,* 12 Cal.4th 186, 199-200.) Nonetheless, we explained, voluntary manslaughter is itself an *offense*, i.e., an unlawful killing distinguished from murder only because it is "without malice" (§ 192). (*Barton, supra,* 12 Cal.4th at p. 199.) Heat of passion and unreasonable self-defense, we observed, merely establish the "lack[] [of] malice" that distinguishes the one offense from the other. (*Ibid.*)

Hence, we concluded, *Wickersham* had not been correct in characterizing unreasonable self-defense as a mere *defense* for purposes of the sua sponte instructional rule of *Sedeno*. ▉ " '[U]nreasonable self-defense,' " we stated, "is . . . not a true defense; rather, it is a shorthand description of one form of voluntary manslaughter. And voluntary manslaughter, *whether it arises from unreasonable self-defense or from a killing during a sudden quarrel or heat of passion*, is not a defense but a crime; more precisely, it is a lesser offense included in the crime of murder. Accordingly, when a defendant is charged with murder the trial court's duty to instruct sua sponte, or on its own initiative, on unreasonable self-defense is the same as its duty to instruct on any other lesser included offense: this duty arises *whenever* the evidence is such that a jury could reasonably conclude that the defendant killed the victim in the unreasonable but good faith belief in having to act in self-defense." (*Barton, supra,* 12 Cal.4th 186, 200-201, italics added.)

Thus, *Barton* concluded, the trial court did not err in that case by instructing on both heat of passion and unreasonable self-defense as theories of voluntary manslaughter, even though the defendant objected to such instructions and both parties had relied on inconsistent theories. As *Barton* explained, "[t]he trial court must instruct on lesser included offenses . . . [supported by the evidence] . . . , regardless of the theories of the case proffered by the parties." (*Barton, supra,* 12 Cal.4th 186, 203.) *Barton* confirmed at length that there was substantial support for both heat of passion and unreasonable self-defense in the confused circumstances surrounding the shooting at issue. (*Id.* at pp. 201-203.)

Under *Barton*, heat of passion and unreasonable self-defense, as forms of a lesser offense included in murder, thus come within the broadest version of

the California duty to provide sua sponte instructions on *all the material issues presented by the evidence.* (*Sedeno, supra,* 10 Cal.3d 703, 715.) In the interests of justice, this rule demands that when the evidence suggests the defendant may not be guilty of the charged offense, but only of some lesser included offense, the jury must be allowed to "consider the *full range* of possible verdicts—not limited by the strategy, ignorance, or mistakes of the parties," so as to "*ensure* that the verdict is no harsher or more lenient than the evidence merits." (*Wickersham, supra,* 32 Cal.3d 307, 324, italics added; see also *Barton, supra,* 12 Cal.4th 186, 196.) The inference is inescapable that, regardless of the tactics or objections of the parties, or the *relative* strength of the evidence on alternate offenses or theories, the rule requires sua sponte instruction on *any and all* lesser included offenses, or theories thereof, which are *supported* by the evidence. In a murder case, this means that both heat of passion and unreasonable self-defense, as forms of voluntary manslaughter, must be presented to the jury if both have substantial evidentiary support.

The People raise several objections to a rule which fails to limit the sua sponte instructional duty to those lesser offenses or theories most obviously and openly presented by the trial record. None of the People's arguments are convincing.

First, the People seek to diminish the force of *Barton* by distinguishing that case in several respects. They suggest *Barton* was solely concerned with the unfairness, to the prosecution in particular, that would arise if the *defendant could preclude* lesser offense instructions which the prosecution actually wished to present. No similar unfairness arose here, the People assert, because the prosecution, like the defense, relied exclusively on a theory other than voluntary manslaughter and neither party sought instructions on heat of passion.

Moreover, the People urge, *Barton* involved a defendant's attack on his conviction of a *lesser included offense* over his objection. *Barton,* they assert, did not establish that a conviction of the *charged* offense may be challenged because the defendant was denied the opportunity for conviction on every latent, if technically plausible, theory of a lesser included offense. Such a rule, the People suggest, allows a defendant to remain silent about instructions, pursue only the strongest line of defense, gamble that the court's "incomplete" lesser offense instructions will produce an acquittal or conviction of the lesser offense, then complain on appeal if convicted of the charged offense.

Aside from *Barton,* the People contend that *Sedeno*'s policies are not furthered by requiring the court, sua sponte, to present the jury with all

supportable theories of a lesser included offense, even those on which the defendant has not relied. So long as the jury may consider at least one theory of a lesser included offense, the People reason, there is no unfair all-or-nothing choice between the charged offense and acquittal. Indeed, the People aver, lesser offense instructions may harm more than help the defendant when they advance theories that are obscure in the evidence, were not pursued in the defense case, and actually contradict the defense presented.

Finally, the People suggest, the sua sponte rule of *Sedeno* stemmed in significant part from a concern that counsel's inadvertence might prejudice the defendant by causing a pertinent lesser included offense to be withheld from the jury. However, the People assert, the doctrine of constitutionally ineffective counsel has developed substantially since *Sedeno* was decided. Today, the People insist, mistaken failures to request lesser offense instructions are best handled through the procedures by which such ineffective assistance may be remedied.

The general answer to these arguments is the one we have already given. The California rule requiring sua sponte instructions on all lesser included offenses, insofar as supported by the evidence, simply addresses concerns broader than those the People identify here. As we have seen, the rule protects both the defendant and the prosecution against a verdict contrary to the evidence, regardless of the parties' own perceptions of their strongest lines of attack or defense. The rule's purpose is not simply to guarantee *some* plausible third choice between conviction of the charged offense or acquittal, but to assure, in the interest of justice, the most accurate possible verdict encompassed by the charge and supported by the evidence.[8]

These overriding considerations exist in every case, regardless of its procedural posture. They would be substantially undermined if a trial court were permitted to limit its instructions on lesser included offenses to those theories the court believes have the greatest merit or conform to the defense

---

[8]A single third option may actually be of little value to either side if arbitrarily chosen and no closer to the jury's rational view of the evidence. We realize that the United States Supreme Court has endorsed the "single third option" idea for purposes of the somewhat anologous federal constitutional right to consideration of lesser included offenses *in capital cases*. In *Schad* v. *Arizona* (1991) 501 U.S. 624 [111 S.Ct. 2491, 2504-2505, 115 L.Ed.2d 555] (*Schad*), the court held that the limited federal guarantee seeks only to prevent the state from coercing a judgment of *death eligibility* by preventing the jury from considering a lesser included noncapital charge as an alternative to setting the defendant free. The *Schad* majority reasoned that this guarantee is fulfilled so long as the capital jury is given *a single* noncapital third option, even if the jury was not instructed on other lesser included noncapital offenses also supported by the evidence. (*Id.* at pp. 646-648 [111 S.Ct. at pp. 2504-2506.) We have never adopted such a restrictive analysis for purposes of California law.

actually presented, while ignoring other theories also supported by the evidence.[9]

■ We therefore affirm that a trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support.
■ Accordingly, we next consider whether there was substantial evidence in this case to support a verdict of manslaughter based on heat of passion. In our view, such evidence existed here.

■ As our prior decisions explain, the existence of *"any* evidence, no matter how weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury. (*Flannel, supra*, 25 Cal.3d 668, 684, fn. 12, original italics; see also *People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 127 [2 Cal.Rptr.2d 335, 820 P.2d 559]; *People* v. *Ramos* (1982) 30 Cal.3d 553, 582 [180 Cal.Rptr. 266, 639 P.2d 908].) "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[]' " that the lesser offense, but not the greater, was committed. (*Flannel, supra*, at p. 684, quoting *People* v. *Carr* (1972) 8 Cal.3d 287, 294 [104 Cal.Rptr. 705, 502 P.2d 513]; accord, *Barton, supra*, 12 Cal.4th 186, 201, fn. 8 ["evidence that a reasonable jury could find persuasive"].)

In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury. (*Flannel, supra*, 25 Cal.3d 668, 684; see also *Wickersham, supra*, 32 Cal.3d 307, 324.) Moreover, as we have noted, the sua sponte duty to instruct on lesser included offenses, unlike the duty to instruct on mere defenses, arises even against the defendant's wishes, and regardless of the trial theories or tactics the defendant has actually pursued. Hence, substantial evidence to

---

[9]Several of the People's arguments—that the sua sponte rule allows the defendant to "gamble" by remaining silent on instructions, that instructions inconsistent with the defendant's trial theory should not be given, and that counsel's failure to request appropriate instructions is an ineffective assistance of counsel issue—do not apply only in the narrow situation before us, but instead attack the heart of the *Sedeno* rule in all its applications. Of course, as we have previously indicated, the People do not ask that we overrule *Sedeno* per se. Indeed, for reasons discussed at length above and in our prior decisions, their arguments would not justify such an action. Insofar as the People's contentions are not convincing in that greater context, they are equally unpersuasive with respect to the more limited issue in this case.

support instructions on a lesser included offense may exist even in the face of inconsistencies presented by the defense itself.[10]

■ An intentional, unlawful homicide is "upon a sudden quarrel or heat of passion" (§ 192(a)), and is thus voluntary manslaughter (*ibid.*), if the killer's reason was actually obscured as the result of a strong passion aroused by a "provocation" sufficient to cause an " 'ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " (*People* v. *Berry* (1976) 18 Cal.3d 509, 515 [134 Cal.Rptr. 415, 556 P.2d 777], quoting *People* v. *Valentine* (1946) 28 Cal.2d 121, 139 [169 P.2d 1]; *People* v. *Borchers* (1958) 50 Cal.2d 321, 328-329 [325 P.2d 97].) " '[N]o specific type of provocation [is] required . . . .' " (*Wickersham, supra,* 32 Cal.3d 307, 326, quoting *People* v. *Berry, supra,* 18 Cal.3d at p. 515.) Moreover, the passion aroused need not be anger or rage, but can be any " ' "[v]iolent, intense, high-wrought or enthusiastic emotion" ' " (*Wickersham, supra,* at p. 327, quoting *People* v. *Berry, supra,* 18 Cal.3d at p. 515) other than revenge (*People* v. *Valentine, supra,* 28 Cal.2d at p. 139). "However, if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter . . . ." (*Wickersham, supra,* 32 Cal.3d at p. 327.)

■ Here, there was evidence that a sizeable group of young men, armed with dangerous weapons and harboring a specific hostile intent, trespassed upon domestic property occupied by defendant and acted in a menacing manner. This intimidating conduct included challenges to the defendant to fight, followed by use of the weapons to batter and smash defendant's vehicle parked in the driveway of his residence, within a short distance from the front door. Defendant and the other persons in the house all indicated that the number and behavior of the intruders, which defendant characterized as a "mob," caused immediate fear and panic. Under these circumstances, a reasonable jury could infer that defendant was aroused to passion, and his

---

[10]This means that substantial evidence of heat of passion and unreasonable self-defense may exist, and the duty to instruct sua sponte may therefore arise, even when the defendant claims that the killing was accidental, or that the states of mind on which these theories depend were absent. For example, in *Barton, supra,* 12 Cal.4th 186, we concluded that when a killing occurred during a heated argument, which itself shortly followed an "upset[ting]" traffic incident between the victim and the defendant's daughter, there was substantial evidence of heat of passion despite the defendant's insistence that he sought only to detain the victim and fired his weapon accidentally. (*Id.* at p. 202.) Insofar as *Sedeno* and *Wickersham* stated or implied a contrary rule (see *Wickersham, supra,* 32 Cal.3d 307, 327-329; *Sedeno, supra,* 10 Cal.3d 703, 719), their analyses stemmed from the assumption, since corrected (see *Barton, supra,* 12 Cal.4th 186, 199-201), that these theories of voluntary manslaughter are mere *defenses* on which the defendant must openly rely before the entitlement to instructions arises.

reason was thus obscured, by a provocation sufficient to produce such effects in a person of average disposition.[11]

A rational jury could also find that the intense and high-wrought emotions aroused by the initial threat had not had time to cool or subside by the time defendant fired the first few shots from inside the house, then emerged and fired the fatal second volley after the fleeing intruders. At one point in his police statement, defendant suggested that he acted in one continuous, chaotic response to the riotous events outside his door.[12] Finally, even though defendant insisted in his police statement that he did not "aim[]" or fire "at them," a jury could reasonably disbelieve that claim and conclude, from all the evidence, that defendant killed intentionally, but while his judgment was obscured due to passion aroused by sufficient provocation.

We therefore conclude that the trial court erred in this case when it failed to instruct, even absent a defense request, on heat of passion as a theory of voluntary manslaughter. The issue remains whether the error warrants reversal of defendant's murder conviction, as the Court of Appeal concluded. While we do not finally resolve this issue, we are persuaded that the standard of reversal employed by the Court of Appeal, in accordance with existing California law, is too strict. As we explain below, that standard can and should be replaced with a rule under which actual prejudice is determined from the whole record. We will therefore remand the cause to the Court of Appeal for a determination of prejudice under correct principles.

*Standard of reversal.*

Under the so-called *Sedeno* standard we have traditionally applied to the erroneous omission of instructions on lesser included offenses, the error requires reversal unless "the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other,

---

[11]The People ask us to rule as a matter of public policy that mere vandalism to an automobile is never sufficient provocation to warrant lesser included offense instructions on voluntary manslaughter. Indeed, we have so suggested. (See *Christian S., supra,* 7 Cal.4th 768, 779, fn. 3.) However, this case presents no such isolated issue. Here the jury could infer that defendant observed an attack on his vehicle, within feet of the entrance to his home, by a large, armed, and clearly hostile group of men who, defendant had reason to suspect, were seeking revenge for the incident of the previous evening, and that defendant feared the intruders intended to force their way into the residence. Such a scenario raises grounds of provocation beyond the "mere" destruction of property.

[12]Thus, defendant stated that "it looks like they're rushing the door, so I break the front window with my hand . . . with the gun and I just start shooting out." Moments later, defendant continued, "[a]nd then they . . . like kept going and I shot out and they kept going and I shot out again and they like started going then I ran out and I'm like just going like this and I'm yelling—I'm . . . trying to get em to stop and I'm just shooting, shooting, shooting and that's it."

properly given instructions." (*Sedeno, supra,* 10 Cal.3d 703, 721.) Here, the jury did not necessarily reject a heat of passion theory under other instructions, and the People do not suggest otherwise.

However, the People urge us to reconsider *Sedeno* in this respect. The *Sedeno* standard, the People insist, is too stringent a test whether the error is of federal constitutional magnitude, or is simply a matter of state law. In either case, the People suggest, reversal is not required if an evaluation of the entire record demonstrates that the error was actually harmless. Defendant insists that the failure to instruct sua sponte on all lesser included offenses supported by the evidence is error under both the state and federal Constitutions. In its federal form, he claims, the error is reversible per se. Alternatively, he contends, *Sedeno* states the minimum level of "prejudice" scrutiny permitted under either state or federal law.

We conclude that the failure to instruct sua sponte on a lesser included offense in a noncapital case is, at most, an error of California law alone, and is thus subject only to state standards of reversibility. We further determine, in line with recent authority, that such misdirection of the jury is not subject to reversal unless an examination of the entire record establishes a reasonable probability that the error affected the outcome. (Cal. Const., art. VI, § 13; *Watson, supra,* 46 Cal.2d 818, 836.) Accordingly, we overrule the *Sedeno* standard of reversal in this context.

At the outset, we reject any implication that the alleged error at issue in this case—the failure to instruct sua sponte on an uncharged lesser included offense, or any aspect thereof—is one which arises under the United States Constitution. In *Modesto,* and again in *Sedeno,* we concluded that the right at issue was "a constitutional right to have the jury determine every material issue presented by the evidence" (*Modesto, supra,* 59 Cal.2d 722, 730; *Sedeno, supra,* 10 Cal.3d 703, 720), but neither those decisions, nor any other of our authorities before or since, specified that we were relying to any degree on *federal* constitutional principles.

Meanwhile, the United States Supreme Court has expressly refrained from recognizing a federal constitutional right to instructions on lesser included offenses in noncapital cases. In *Keeble* v. *United States* (1973) 412 U.S. 205 [93 S.Ct. 1993, 36 L.Ed.2d 844] (*Keeble*), the court confirmed that under rule 31(c) of the Federal Rules of Criminal Procedure (18 U.S.C.) (rule 31(c)), applicable only in federal criminal actions, the defendant is entitled to instructions on a lesser included offense if the jury could rationally find guilt of the lesser offense but acquit of the greater. (412 U.S. at pp. 208-209

[93 S.Ct. at pp. 1995-1996].)[13] The court concluded that the rule 31(c) entitlement applied to trials under the Major Crimes Act (MCA), the federal criminal law governing offenses by Native Americans on reservation land, even where the lesser included offense on which instructions were sought was one otherwise not subject to prosecution under the MCA, but only under tribal law. (*Keeble, supra,* 412 U.S. at pp. 208-214 [93 S.Ct. at pp. 1995-1999].) While constitutional concerns influenced the court's analysis of the relationship between rule 31(c) and the MCA, the decision noted "we have never explicitly held that the Due Process Clause of the Fifth Amendment guarantees the right of a defendant to have the jury instructed on a lesser included offense . . . . In view of our interpetation of the [MCA], those are questions that we need not face." (*Keeble, supra,* at p. 213 [93 S.Ct. at p. 1998], fn. omitted.)[14]

Subsequently, the high court acknowledged that in particular circumstances, the denial of instructions on lesser included offenses *in a capital case* would violate the federal Constitution. However, the court emphasized that it was limiting its holding to the capital context. Moreover, the strict limitations the court has since placed even on the rule for capital trials suggest reluctance to formulate any general constitutional right to instructions on lesser offenses.

Thus, in *Beck* v. *Alabama* (1980) 447 U.S. 625 [100 S.Ct. 2382, 65 L.Ed.2d 392] (*Beck*), the court concluded that Alabama could not constitutionally impose a death sentence after applying a state statute, limited to

---

[13]Rule 31(c) provides in relevant part: "The defendant may be found guilty of an offense necessarily included in the offense charged . . . ." A California statute, Penal Code section 1159, similarly provides that "[t]he jury, or the judge if a jury trial is waived, may find the defendant guilty of any offense, the commission of which is necessarily included in [the offense] with which he is charged . . . ."

[14]The high court has since revisited the issue of lesser offense instructions in only one subsequent noncapital case, *Schmuck* v. *United States* (1989) 489 U.S. 705 [109 S.Ct. 1443, 103 L.Ed.2d 734] (*Schmuck*). *Schmuck,* like *Keeble,* was a rule 31(c) decision; no constitutional issue was presented, and none was decided. *Schmuck* concluded that because rule 31(c) embodies a strict elements approach to lesser necessarily included offenses, the parties to a federal criminal action are not entitled to instructions on lesser offenses which, though arguably related to the charged offense in some way, contain statutory elements not found in the charged offense. (*Schmuck, supra,* 489 U.S. at pp. 715-721 [109 S.Ct. at pp. 1450-1453].) The defendant in *Schmuck,* like the accused in *Keeble,* had requested a lesser offense instruction, and in both decisions, the court noted the long-standing principle that the rule entitles the defendant to instructions on lesser included offenses supported by the evidence. (*Schmuck, supra,* 489 U.S. at p. 717 [109 S.Ct. at p. 1451]; *Keeble, supra,* 412 U.S. 205, 208 [93 S.Ct. 1993, 1995-1996].) *Schmuck* further noted that the rule implies an entitlement to such instructions by *both* parties "without distinguishing between a *request* for [such] instructions made by the Government and one made by the defendant." (*Schmuck, supra,* 489 U.S. at p. 717 [109 S.Ct. at p. 1451], italics added.) No claim arose in either *Keeble* or *Schmuck* that rule 31(c) requires a federal court to instruct sua sponte on lesser included offenses, and the United States Supreme Court has never confronted that issue.

capital cases, that prohibited the jury from considering a lesser noncapital offense necessarily included within the capital charge and supported by the evidence. The court made clear at the outset that "we have never held that a defendant is entitled to a lesser included offense instruction as a matter of due process." (*Id.* at p. 637 [100 S.Ct. at p. 2389].) On the other hand, the court noted the "value to the defendant of this procedural safeguard," as evidenced by "the nearly universal acceptance . . . in both state and federal courts" that a defendant is entitled to instructions on lesser included offenses warranted by the evidence. (*Ibid.*) Indeed, the court pointed out, Alabama itself granted the right under appropriate circumstances in noncapital cases. (*Id.* at pp. 636-637 [100 S.Ct. at pp. 2389-2390].) Such protection, the court reasoned, is "especially important" in a capital case, and the risk that a jury will convict of the charged offense as an alternative to complete acquittal when it believes the evidence shows only some lesser crime "cannot be tolerated in a case in which the defendant's life is at stake." (*Id.* at p. 637 [100 S.Ct. at p. 2389].) "Thus, if the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, [the state] is constitutionally prohibited from withdrawing that option from the jury in a capital case." (*Id.* at p. 638 [100 S.Ct. at p. 2390].)

The *Beck* rule has never since been extended beyond the capital context. Moreover, in two more recent cases, the high court has given *Beck* itself a narrow construction.

In *Schad, supra,* 501 U.S. 624, a five-justice majority rejected a capital defendant's contention that although his jury *was* instructed on the lesser included offense of second degree murder, he was additionally entitled to instructions on the lesser included offense of robbery. The *Schad* majority explained that the Eighth Amendment concerns at issue in *Beck* are focused entirely on the reliability of the capital verdict itself, i.e., whether the jury may have been forced, by an all-or-nothing verdict option, to convict of a capital crime against its view of the evidence in order to avoid complete acquittal. (*Id.* at pp. 646-647 [111 S.Ct. at pp. 2504-2505].) Hence, the majority reasoned, *Beck* is satisfied if a capital jury receives only a single noncapital third option between the capital charge and acquittal, since this relieves the all-or-nothing pressure to return an inaccurate *capital* verdict in order to avoid acquitting the defendant entirely. (*Id.* at p. 647 [111 S.Ct. at p. 2505].)[15]

Recently, in *Hopkins* v. *Reeves* (1998) 524 U.S. 88 [118 S.Ct. 1895, 141 L.Ed.2d 76] (*Reeves*), the high court concluded that the principles of *Beck*

---

[15]As indicated at length above, we have identified broader concerns as the basis of the California rule requiring sua sponte instructions on all lesser included offenses supported by the evidence. These principally include the policy that the jury, in the performance of its "truth-ascertainment function" (*Barton, supra,* 12 Cal.4th 186, 196), shall be exposed to "the

did not require Nebraska to provide instructions on lesser *nonincluded* offenses in capital cases when it did not allow such instructions in noncapital cases. As the central core of its analysis, the *Reeves* court noted that the Nebraska scheme before it was distinguishable "in two critical respects" from the invalid Alabama statute at issue in *Beck.* (*Reeves, supra,* 524 U.S. at p. __ [118 S.Ct. at p. 1900].) First, Nebraska, unlike Alabama, *permitted* instructions in capital cases, as in noncapital cases, on lesser offenses it deemed to be *included* in the capital charge. (*Ibid.*) Therefore, Nebraska erected no " 'artificial barrier' " in a capital case to conviction of a noncapital offense as an alternative to acquittal. (*Ibid.*) Second, Nebraska denied instructions on *nonincluded* offenses to all defendants, capital and noncapital, and thus, unlike Alabama, "did [not] treat capital cases differently from noncapital cases." (*Ibid.*)

*Reeves* observed that "[b]y ignoring these distinctions" to conclude that the Eighth Amendment required Nebraska to allow instructions on nonincluded offenses in capital cases, the court of appeals had unjustifiably "limited state sovereignty in a manner more severe than the rule in *Beck.*" (*Reeves, supra,* 524 U.S. 88, __ [118 S.Ct. 1895, 1901].) *Beck,* the *Reeves* court reasoned, stands only for the proposition "that a State may not erect a *capital-specific, artificial* barrier to the provision of instructions that actually are lesser included offenses under state law." (*Reeves, supra,* 524 U.S. at p. __ [118 S.Ct. at p. 1901], italics added.)[16]

Thus, the high court's decisions leave substantial doubt that the federal Constitution confers *any* right to lesser included offense instructions in noncapital cases. They provide no basis whatever for a conclusion that the federal charter would require such instructions, as does California, *on the court's own motion.* Indeed, this court has explicitly recognized that the

full range of possible verdicts," so that it may reach the *correct* verdict on the evidence, not one either "harsher or more lenient than the evidence merits." (*Wickersham, supra,* 32 Cal.3d 307, 324.)

[16]Justice Thomas's opinion in *Reeves* noted in passing that "[a]lmost all States, including Nebraska, provide instructions only on those offenses that have been deemed to constitute lesser included offenses of the charged crime. [Citation.] *We have never suggested that the Constitution requires anything more.*" (*Reeves, supra,* 524 U.S. 88, __ [118 S.Ct. 1895, 1901], fn. omitted, italics added.) This statement was made in the context of a capital case, and no implication arises that the court *had* recognized a constitutional right to instructions on lesser included offenses *in any other circumstance.* As the foregoing discussion demonstrates, the court has long avoided any such holding.

We note that the analyses of *Reeves,* and of *Schmuck, supra,* 489 U.S. 705, insofar as they demonstrate difficulties with a requirement of instructions on lesser *nonincluded* offenses, are among the considerations which have today prompted us, in a companion decision, to abrogate the California rule entitling the defendant to demand instructions on lesser merely related offenses supported by the evidence. (*Birks, supra,* 19 Cal.4th 108, overruling *Geiger, supra,* 35 Cal.3d 510.)

California rule requiring sua sponte instructions on lesser included offenses suggested by the evidence is independent of federal law. (*Geiger, supra*, 35 Cal.3d 510, 519.)

Accordingly, we affirm that the rule requiring sua sponte instructions on all lesser necessarily included offenses supported by the evidence derives exclusively from California law. In light of the United States Supreme Court's careful disclaimers, and its tendency to interpret related federal rules, both constitutional and nonconstitutional, in a narrow way, we decline to do what the high court has expressly not done—to hold that such an instructional rule is required in noncapital cases by the federal Constitution.[17]

Defendant asserts, however, that where, as here, instructions on a lesser included offense *were* given as a matter of state law, the incompleteness of those instructions constitutes federal constitutional error subject to federal standards of appellate review. First, defendant briefly suggests that "the failure to instruct on heat of passion *manslaughter* effectively omitted an element of *the offense* and removed the issue of provocation negating malice from the jury." (Italics added.) This, defendant urges, is a form of instructional error subject to direct scrutiny under the federal Constitution.[18]

We are not persuaded. Defendant was not convicted of manslaughter on the basis of incomplete instructions, but of murder, an offense supported by the evidence as to which defendant claims no misinstruction. His complaint, as we read it, is not that an element of the charged offense of murder was removed from the jury's consideration, but simply that the omission of an

---

[17]We may, of course, depart from the federal Constitution in ruling on questions of California criminal procedure, and our interpretations of the California Constitution are not limited by federal law. (*Raven* v. *Deukmejian* (1990) 52 Cal.3d 336, 353-354 [276 Cal.Rptr. 326, 801 P.2d 1077].) Even if "cogent reasons" must exist to interpret a state constitutional provision differently from a similarly worded provision of the United States Constitution (*id.* at p. 353, and cases cited), the reasons for the long-established California approach to instructions on lesser included offenses, both as a matter of state constitutional law and under general principles of criminal procedure, have been set forth at length in our decisions. Of course, we face here no *direct repudiation* of an entitlement to lesser included offense instructions by the United States Supreme Court. Indeed, as we have explained, federal law other than the Constitution provides this entitlement, at least upon request, in all federal prosecutions, and the high court has noted both its value and its widespread acceptance among the states. Finally, we stress again that in this case, the People raise no *general* objection to the *Sedeno* instructional rule, including its sua sponte aspect. They merely seek to limit application of the rule in the limited circumstances presented by this case.

[18]Though Justice Kennard suggests otherwise, the quoted words "the offense," as italicized in the text, can only refer to the antecedent "heat of passion *manslaughter*." (Italics added.) Hence, there can be no inference that defendant seeks to raise, for the first time in this appeal, a claim that the jury was misinstructed on murder. (See also text discussion & fn. 19, *post*.)

"element" of voluntary manslaughter denied him full jury consideration of that *lesser alternative* to murder. As explained above, the United States Supreme Court has acknowledged the value of lesser included offense instructions as a safeguard against overconviction in lieu of an equally unwarranted acquittal. However, the high court has explicitly refrained from according these interests federal constitutional stature in noncapital cases. It thus appears likely the United States Supreme Court would deem a state conviction for a charged noncapital offense to be untainted by federal constitutional error *in the complete absence* of unrequested instructions on lesser included offenses. Under these circumstances, defendant's conviction cannot acquire such a taint simply because instructions on a lesser included offense were given but, as provided in the absence of a defense request, were incomplete.[19]

Citing *Hicks* v. *Oklahoma* (1980) 447 U.S. 343 [100 S.Ct. 2227, 65 L.Ed.2d 175] (*Hicks*), defendant urges at somewhat greater length that he had a state-created liberty interest in a jury determination, even absent a request therefor, of all issues bearing on his guilt of the lesser included offense of voluntary manslaughter as an alternative to the charge of murder. The incomplete manslaughter instructions, defendant insists, denied him this right with respect to the issue whether heat of passion rendered him guilty only of the lesser offense. The denial of this state-created right to jury findings, defendant avers, cannot be cured under the federal Constitution by any form of appellate review that speculates on what a properly instructed jury would have done. (See *Hicks, supra,* 447 U.S. at pp. 346-347 [100 S.Ct. at pp. 2229-2230]; see also *Clemons* v. *Mississippi* (1990) 494 U.S. 738, 746 [110 S.Ct. 1441, 1447, 108 L.Ed.2d 725] (*Clemons*)).

---

[19]Justice Kennard apparently agrees in general that the failure to instruct fully, sua sponte, on a lesser included offense supported by the evidence is state law error alone. However, noting the "unique" role of malice in distinguishing murder from voluntary manslaughter (*post,* at p. 187 (dis. opn. of Kennard, J.)), she suggests the failure to instruct sua sponte, where evidence of heat of passion existed, that an intentional, unlawful killing is nonetheless without malice if done in a heat of passion, and thus constitutes not murder but voluntary manslaughter, caused the definition of the malice element of *murder,* the charged offense, to be incomplete. Such defective instructions on an *element of the charge and conviction,* she concludes, are a form of federal constitutional error. Whatever the merits of this hypothesis, however, defendant, the appellant in this case, has simply not raised it. Throughout his briefs on appeal, both in the Court of Appeal and in this court, defendant has argued only that the failure to instruct on heat of passion was error because it partially removed the *lesser offense option of voluntary manslaughter* from the jury's consideration. (See also text discussion & fn. 18, *ante.*) Even if certain passages of the People's brief on the merits in this court may be interpreted as an attempt to *anticipate,* in an abundance of caution, the approach now taken by Justice Kennard, our conclusion that the issue is not properly before us does not change. The fact remains that defendant himself has never advanced the contention anticipated by the People. Even with their prompting, he has never explicitly asserted, let alone developed the argument, that the instructions in this case are defective under federal law because they incompletely defined the malice element *of murder.* The issues presented by such a claim must properly await a case in which they have been clearly raised and fully briefed.

However, defendant's argument lacks merit for reasons we recently set forth in *People* v. *Wims* (1995) 10 Cal.4th 293 [41 Cal.Rptr.2d 241, 895 P.2d 77] (*Wims*). *Wims* addressed what standard of reversal should apply when the state statutory right (see § 969c) to jury determination of the truth of a noncapital sentencing enhancement (there, use of a dangerous and deadly weapon (§ 12022, subd. (b)) is violated by instructional omission of an element of the enhancement. *Wims* held that such misinstruction is state law error alone, and thus subject, under article VI, section 13 of the California Constitution, to the *Watson* harmless error test. In reaching this conclusion, *Wims* rejected the argument that the state-created right to jury determination of noncapital sentencing enhancements implicates federal due process interests under *Hicks*, and thus precludes harmless error review under state standards.

As *Wims* explained, *Hicks* focused on a state statutory scheme that generally accorded *sentencing power and discretion* to the jury. The defendant's jury, however, had been prevented from exercising this discretion by a specific statute that mandated a 40-year term for habitual offenders. The habitual offender provision was ruled unconstitutional after trial but before the appeal was decided. State law would have allowed the appellate court to uphold the 40-year sentence by substituting its sentencing judgment for the jury's, but the appellate court did not do so. Instead, it affirmed on the sole ground that the sentence was within the range the jury could have imposed even absent the invalid mandatory provision. Under these circumstances, *Hicks* held, the defendant had not received his due process right to the actual exercise of sentencing discretion by either of the entities in which, by state law, such discretion resided. (*Hicks*, *supra*, 447 U.S. 343, 347 [100 S.Ct. 2227, 2230]; *Wims*, *supra*, 10 Cal.4th 293, 309.)

But in *Wims*, we found the circumstances before us distinguishable from *Hicks* in crucial ways. Unlike the laws at issue in *Hicks*, the California noncapital sentence-enhancement scheme affords a defendant no right to normative jury *discretion* in sentencing, but only the narrower right to a *fact-finding* determination as to the *truth* of an alleged enhancement. Moreover, omission of an element of an enhancement does not entirely deprive the defendant of a jury determination of the enhancement itself; indeed, the jury in *Wims* "*did* render verdicts on each weapon-use allegation." (*Wims*, *supra*, 10 Cal.4th 293, 310, original italics.) This form of state law error, *Wims* concluded, thus does not invoke the rationale of *Hicks*. (*Ibid.*; see also *People* v. *Odle* (1988) 45 Cal.3d 386, 411-412 [247 Cal.Rptr. 137, 754 P.2d 184] [holding *Hicks* rationale not applicable to a failure to instruct on the elements of a special circumstance].)

In addition, *Wims* noted, in *Clemons*, *supra*, 494 U.S. 738, the high court made clear that *Hicks* imposes no absolute federal due process bar against

application of normal state law standards of appellate review of a defective jury sentencing determination, the right to which also arose under state law. (*Clemons, supra*, 494 U.S., 738, 741, 747 [110 S.Ct. 1441, 1444, 1447-1448]; *Wims, supra*, 10 Cal.4th 293, 310.) *Clemons* thus supports the view, *Wims* reasoned, that any right to a jury determination arising from state law is *"qualified" and limited* by the *state law standards of appellate review* applicable to that determination. (*Wims, supra*, 10 Cal.4th at p. 310, italics added.)

"The high court's reasoning in *Clemons* [thus] applies to California's scheme for section 12022[, subdivision ](b) sentence enhancements. Defendants' state statutory right to jury findings on [such an] enhancement is constitutionally qualified by the duty of California appellate courts to examine 'the entire cause' when any 'misdirection of the jury' is alleged and to affirm the judgment absent a 'miscarriage of justice.' (Cal. Const., art. VI, § 13.) Contrary to defendants' suggestion, therefore, if we examine the record of this trial to determine whether the instructional error resulted in a miscarriage of justice, we do not engage in any impermissible attempt to 'substitute' our determination for the jury determination a defendant may claim under section 969c. Indeed, the possibility of such a corrective appellate determination is inherent in the state statutory scheme for jury determination. When rendered, such appellate review complements, and thus affords, defendants their full jury rights and, thus, due process of law under *Hicks*. [Citation.]" (*Wims, supra*, 10 Cal.4th 293, 310-311.)

Similar principles apply here. The state constitutional requirement of sua sponte instructions allowing a jury determination of lesser uncharged offenses creates only a right to jury factfinding, not to the exercise of normative jury discretion. Moreover, that right is itself qualified and limited by the standards of appellate review also established by the state Constitution. When we assert and exercise our power to review the error in this way, we usurp no due process interest identified by *Hicks*. Defendant's claim must therefore be dismissed.

 When "state standards alone have been violated, the State is free . . . to apply its own state harmless-error rule to such errors of state law." (*Cooper* v. *California* (1967) 386 U.S. 58, 62 [87 S.Ct. 788, 791, 17 L.Ed.2d 730].) We therefore determine that federal law has no effect on the appropriate standard of California appellate review when, in a noncapital case, the defendant challenges his otherwise valid conviction of a charged offense on grounds the trial court failed *in its sua sponte duty* under California law to provide instructions, correct and complete, on all lesser included offenses, including all theories thereof, which enjoyed substantial support in the

evidence. It remains to consider whether correct principles of *California* jurisprudence require, or even permit, continued adherence to the strict *Sedeno* standard of reversal for this form of state law error. We conclude they do not.

As we have explained in several recent decisions, the California Constitution, unlike its federal counterpart, contains a provision specifically addressed to the issue of reversible error. It provides that "[n]o judgment shall be set aside" for various kinds of error in the conduct of the trial, including "misdirection of the jury" and "improper admission or rejection of evidence," unless "an examination of the *entire cause, including the evidence*" indicates that the error resulted in a "miscarriage of justice." (Cal. Const., art. VI, § 13, italics added.)[20] This provision was " 'added by the electorate of this state for the specific purpose of *abrogating* the preexisting rule that had treated any substantial error as reversible per se.' " (*Wims, supra,* 10 Cal.4th 293, 314, quoting *People* v. *Cahill* (1993) 5 Cal.4th 478, 501 [20 Cal.Rptr.2d 582, 853 P.2d 1037] (*Cahill*), original italics.)

The phrase "misdirection of the jury," as used in the constitutional provision, extends to the form of error at issue here. " ' "The word 'misdirection' logically includes every kind of instructional error. It seems manifest that incorrect, ambiguous, conflicting, or wrongly omitted instructions may equally 'misdirect' the jury's deliberations. Nothing in the language or history of article VI, section 13, suggests that its requirement of actual prejudice, determined by reference to 'the entire cause, including the evidence,' applies to some forms of 'misdirection,' but not to others." (*Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 579 [34 Cal.Rptr.2d 607, 882 P.2d 298].)' " (*People* v. *Flood* (1998) 18 Cal.4th 470, 487 [76 Cal.Rptr.2d 180, 957 P.2d 869] (*Flood*), quoting *Wims, supra,* 10 Cal.4th 293, 314-315.)

In *Cahill*, a renewed focus on the meaning of article VI, section 13 of the California Constitution caused us to conclude that we must abandon, insofar as based on state law, the decades-old California rule of automatic reversal where an involuntary confession was erroneously admitted in a criminal trial. *Cahill* reasoned as follows: Article VI, section 13 eliminated the prior appellate presumption that any substantial trial error causes a miscarriage of justice. The Constitution's requirement that the record and evidence be examined for actual unfair harm in the particular case specifically applies to

---

[20]Article VI, section 13 of the California Constitution provides: "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

errors in the admission of evidence. This duty is not eliminated simply because the error complained of was itself constitutional. In rare instances involving "fundamental 'structural defects' " (*Cahill, supra,* 5 Cal.4th at p. 502) in a criminal proceeding (for example, the complete denial of the right to a jury, or to an impartial judge), it may be impossible, or beside the point, to evaluate the resulting harm by resort to the trial record, and a miscarriage of justice may arise regardless of the evidence. ■■ However, the improper admission of a confession, even if state constitutional error, is an evidentiary mistake, a mere "trial error" (*ibid.*) that occurred during the presentation of the case to the jury. The effect of this form of error can be quantitatively assessed in light of the evidence to determine whether the error was prejudicial or harmless. (*Id.* at pp. 487-502; also cf. *Arizona* v. *Fulminante* (1991) 499 U.S. 279, 307-309 [111 S.Ct. 1246, 1263-1265, 113 L.Ed.2d 302].)

■■ "As we have seen, the California reversible-error provision, by its terms, directs that the prejudicial nature of such an evidentiary error be determined 'after an examination of the entire cause, including the evidence.' (Cal. Const., art. VI, § 13.)" (*Cahill, supra,* 5 Cal.4th 478, 502.) Under such circumstances, "[t]he prejudicial effect of such error is to be determined, for purposes of California law, under the generally applicable reasonable-probability test embodied in article VI, section 13 . . . . [Citing *Watson, supra,* 46 Cal.2d 818, 836.]" (*Cahill, supra,* 5 Cal.4th at pp. 509-510.)[21]

We have since invoked similar principles to conclude that the *Watson* harmless error test applies to two forms of state law *instructional* error in criminal trials. In *Wims, supra,* 10 Cal.4th 293, we held that where the right to a jury trial on a noncapital sentence enhancement arises solely from state law, the erroneous omission to instruct on an element of the enhancement is subject, by virtue of California Constitution, article VI, section 13, to the *Watson* standard of reversal. (*Wims, supra,* 10 Cal.4th at pp. 314-316.) In *Flood, supra,* 18 Cal.4th 470, we ruled that any state law error arising from a failure to instruct on an element of a charged criminal offense must,

---

[21]*Cahill* rejected the notion that California's automatic reversal rule for involuntary confessions was based on some ground, such as the deterrence of official misconduct, which was independent of the fairness and accuracy of the trial itself. (*Cahill, supra,* 5 Cal.4th 478, 506-507.) Instead, *Cahill* noted, the apparent California rationale for the rule was a general assumption that confessions have a " 'bombshell' " effect on the juries that hear them. (*Id.* at p. 503.) In using this assumption to justify a rule of reversibility per se, *Cahill* observed, the prior decisions "lost sight of the principal purpose and significance" of California Constitution article VI, section 13. (5 Cal.4th at p. 503.) The fact that an improperly admitted confession might often be expected to cause prejudice did not abrogate the constitutional requirement that the actual effect of the error be examined in each individual case. (*Ibid.*)

pursuant to article VI, section 13, be evaluated under *Watson*, despite prior California cases suggesting that with limited exceptions, such error is reversible per se. (*Flood*, *supra*, 18 Cal.4th at pp. 480-491.)

As both *Wims* and *Flood* make clear, misdirection of the jury, like the improper admission of evidence at issue in *Cahill*, is a form of error for which the California Constitution expressly requires an individualized prejudice assessment. (*Flood*, *supra*, 18 Cal.4th 470, 487-490; *Wims*, *supra*, 10 Cal.4th 293, 314.) Moreover, as in *Cahill*, the missteps at issue in both *Wims* and *Flood* were mere errors in the presentation of the case to the jury, not fundamental structural defects that rendered the proceedings unfair regardless of the evidence. (*Flood*, *supra*, 18 Cal.4th at pp. 489-490; *Wims*, *supra*, 10 Cal.4th at pp. 312-314.)

Similar principles govern here, and their application requires abrogation of the *Sedeno* standard of near-automatic reversal. We explain our reasoning in detail.

The stringent *Sedeno* test of near-automatic reversal for erroneous failure to instruct on lesser included offenses had its origins in *Modesto*, *supra*, 59 Cal.2d 722. *Modesto* held that, where the evidence supported such instructions, their omission violated the defendant's "constitutional right to have the jury determine every material issue presented by the evidence." (*Id.* at p. 730.) *Modesto* then expressly rejected application of the *Watson* standard to determine whether the error was reversible, reasoning that "[r]egardless of how overwhelming the evidence of guilt may be, the denial of such a fundamental right cannot be cured by article VI, [former] section 4½ [now section 13] of the California Constitution, for the denial of such a right is itself a miscarriage of justice within the meaning of that provision." (*Modesto*, *supra*, 59 Cal.2d 722, 730.)

*Sedeno*, *supra*, 10 Cal.3d 703, later modified *Modesto* to the extent of acknowledging that *Modesto* error could be deemed harmless if the issue which would have been presented by the omitted instructions on lesser included offenses was necessarily resolved adversely to the defendant under other, proper instructions. (*Sedeno*, *supra*, 10 Cal.3d at p. 721.) With this limited exception, however, the erroneous failure to instruct on a lesser included offense supported by the evidence has remained subject to the *Modesto* rule of automatic reversal.[22]

Neither *Modesto* nor *Sedeno* provided significant analysis to support the conclusion that the California Constitution precludes, *rather than requires*,

---

[22]Neither *People* v. *Cantrell* (1973) 8 Cal.3d 672 [105 Cal.Rptr. 792, 504 P.2d 1256] (*Cantrell*) nor *People* v. *Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267] (*Thornton*), as later synthesized in *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265,

examination of the *entire record, including the evidence*, for actual harm. Indeed, as we recently observed, none of the authorities cited by *Modesto* to support a standard of per se reversal for this form of error compelled any such holding. (*Flood, supra*, 18 Cal.4th 470, 488, and cases cited.)[23]

We now conclude that the rigid *Modesto* standard, even as slightly modified by *Sedeno*, is a violation of article VI, section 13 of the California Constitution. As we have seen, that provision requires that in cases of "misdirection of the jury," an appellate court must examine the "entire cause, including the evidence," to determine if a "miscarriage of justice" occurred. (*Ibid.*) This obligation cannot be avoided by *Modesto*'s device of asserting, as an ipse dixit, that a particular form of error is itself a miscarriage of justice, regardless of the evidence.

The error in failing sua sponte to instruct, or to instruct fully, on a lesser included offense is not a fundamental structural defect in the mechanism of the criminal proceeding (*Cahill, supra*, 5 Cal.4th 478, 502) which cannot or should not be evaluated for prejudice by reference to "the entire cause, including the evidence" (Cal. Const., art. VI, § 13). Instead, like the erroneous introduction of an involuntary confession, or the instructional omission of an element of a charged offense or sentencing enhancement, it is a mere trial error, one committed in the presentation of the case to the jury. By the same token, the probable adverse effect of an erroneous failure to provide a lesser offense option in a particular case can readily be assessed by an individualized, concrete examination of the record in that case. Under such circumstances, as in *Cahill*, the error must therefore be evaluated under the generally applicable California test for harmless error, that set forth in *Watson*.[24]

---

684 P.2d 826] (*Garcia*), state additional exceptions to the rule of per se reversal for *Modesto* error. *Garcia* concluded that under the so-called *Cantrell-Thornton* rule applicable to omitted instructions on the *elements* of a charged offense or special circumstance, automatic reversal was not required "where the parties recognized that [the omitted element] was in issue, presented all the evidence at their command on that issue, and . . . *the record not only establishes the [missing element] as a matter of law but shows the contrary evidence not worthy of consideration.*" (*Garcia, supra*, 36 Cal.3d at p. 556, fn. omitted, italics added.) In the evidentiary circumstances described—i.e., a complete absence of "worthy" evidence on the omitted issue—no *duty* to instruct on a lesser included offense would arise under *Modesto* and *Sedeno*.

[23]As *Flood* explained, *People* v. *Phillips* (1966) 64 Cal.2d 574 [51 Cal.Rptr. 225, 414 P.2d 353] and subsequent cases had mistakenly extended *Modesto*'s automatic reversal rule to the erronous withdrawal of an element of the charged offense from the jury's consideration. (*Flood, supra*, 18 Cal.4th 470, 484.)

[24]Here, as in *Cahill*, there is no indication the error in question implicates concerns independent of fair trial procedures, such as deterrence of official misconduct, so that reversal only for prejudice in the trial itself would defeat the purpose of the underlying rule.

A different result cannot be reached by characterizing the error as the denial of the defendant's "fundamental" right to a jury determination of all the material issues, then reasoning that an appellate court's determination of harmlessness on the evidence cannot cure the deprivation. As *Wims* indicated, any state law right to a jury determination of particular issues is qualified in turn by the appellate review standards set forth in article VI, section 13 of the California Constitution. (*Wims, supra,* 10 Cal.4th 293, 310-311.) And as *Cahill* affirmed, the Constitution's bar against appellate reversals where error was harmless applies even when the error itself arose under the same charter. (*Cahill, supra,* 5 Cal.4th 478, 490-491; see also *Flood, supra,* 18 Cal.4th 470, 479-491.)

Nor can it be said that an erroneous failure to instruct on a lesser included offense is *necessarily* prejudicial, on the premise that if the evidence was substantial enough to warrant lesser offense instructions in the first place, it must have been strong enough to affect the outcome had the instructions not been omitted. In fact, the two standards of evidentiary review are distinct.

As explained above, under *Modesto, Sedeno,* and their progeny, the sua sponte duty to instruct on a lesser included offense arises if there is substantial evidence the defendant is guilty of the lesser offense, but not the charged offense. (*Flannel, supra,* 25 Cal.3d 668, 684-685.) This standard requires instructions on a lesser included offense whenever " 'a jury composed of reasonable [persons] *could . . . conclude*[]' " that the lesser, but not the greater, offense was committed. (*Id.* at p. 684, italics added, quoting *People v. Carr, supra,* 8 Cal.3d 287, 294.) In deciding whether evidence is "substantial" in this context, a court determines only its bare legal sufficiency, not its weight. (See *Flannel, supra,* 25 Cal.3d 668, 684; see also *Wickersham, supra,* 32 Cal.3d 307, 324.)

Appellate review under *Watson,* on the other hand, takes an entirely different view of the evidence. Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result. Accordingly, a determination that a duty arose to give instructions on a lesser included offense, and that the omission of such instructions in whole or in part was error, does not resolve the question whether the error

was prejudicial. Application of the *Watson* standard of appellate review may disclose that, though error occurred, it was harmless.[25]

Accordingly, we conclude that in a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under *Watson*. A conviction of the charged offense may be reversed in consequence of this form of error only if, "after an examination of the entire cause, including the evidence" (Cal. Const., art. VI, § 13), it appears "reasonably probable" the defendant would have obtained a more favorable outcome had the error not occurred (*Watson, supra*, 46 Cal.2d 818, 836).[26]

As indicated above, the Court of Appeal in the present case did not attempt to evaluate the erroneous omission of instructions on heat of passion by examining the entire record, including the evidence, to determine whether it was reasonably probable the error affected the outcome. Instead, the court applied prior California decisions requiring that defendant's conviction be reversed unless the jury necessarily resolved the erroneously omitted heat of passion issue in another context. Because we here overrule the authority on

---

[25]On the other hand, we disagree with Justice Mosk's assertion that if the defendant was convicted of the charged offense on substantial evidence, any error in failing to instruct on a lesser included offense must be *harmless per se*. Justice Mosk's premise is that such error affects only the lesser offense of which the defendant was not convicted. But the very purpose of the rule is to allow the jurors to convict of *either* the greater or the lesser offense where the evidence might support either. That the jury chose the greater over acquittal, and that the evidence technically permits conviction of the greater, does not resolve the question whether, "after an examination of the entire cause, including the evidence" (Cal. Const., art. VI, § 13), it appears reasonably probable the jury would nonetheless have elected the lesser if given that choice. Depending on the circumstances of an individual case, such an examination may reveal a reasonable probability that the error affected the outcome in this way.

[26]In abrogating the *Sedeno* standard of reversal for instructional error on lesser included offenses in noncapital cases, we depart from the "fundamental," though "flexible," jurisprudential policy of stare decisis. (*People* v. *Latimer* (1993) 5 Cal.4th 1203, 1212-1213 [23 Cal.Rptr.2d 144, 858 P.2d 611] (*Latimer*).) As other recent decisions of this court demonstrate, such departure is compelled by our reexamination of the meaning of the "miscarriage of justice" clause of the California Constitution (art. VI, § 13), a matter on which we are the final arbiter. We discern no institutional or societal reliance interests that weigh strongly against the new rule we announce today. (E.g., *Latimer, supra*, 5 Cal.4th at p. 1213.) We also reject defendant's contention that any such new rule may not be applied "retroactively" to his or any other pending case. Due process does not require such a result, since the change in appellate review standards adopted in this opinion neither expands criminal liability nor enhances punishment for a crime previously committed. (*People* v. *Cuevas* (1995) 12 Cal.4th 252, 275 [48 Cal.Rptr.2d 135, 906 P.2d 1290] (*Cuevas*); see *Bouie* v. *City of Columbia* (1964) 378 U.S. 347, 352-354 [84 S.Ct. 1697, 1701-1703, 12 L.Ed.2d 894].) Nor does it implicate any other cognizable reliance interest of individual criminal defendants. (*Cuevas, supra*, 12 Cal.4th at p. 276; cf., e.g., *People* v. *Scott* (1994) 9 Cal.4th 331, 357-358 [36 Cal.Rptr.2d 627, 885 P.2d 1040].) We therefore conclude that our decision may have full retroactive effect.

which the Court of Appeal relied, we deem it appropriate to remand the matter to the Court of Appeal to permit that court to determine prejudice under the principles established herein. If the Court of Appeal concludes by correct standards that the error was harmless, it should then address the additional issues raised by defendant on appeal. (*Cahill, supra*, 5 Cal.4th 478, 510.)

## CONCLUSION

The judgment of the Court of Appeal is reversed insofar as it holds that defendant's murder conviction must be reversed because the heat of passion issue erroneously omitted from instructions on the lesser included offense of voluntary manslaughter was not necessarily resolved by the jury in another context. The cause is remanded to the Court of Appeal for further proceedings consistent with the views expressed in this opinion.

George, C. J., Werdegar, J., and Chin, J., concurred.

**MOSK, J.**—I dissent.

In this cause, as in many others, the analysis required of the reviewing court entails consideration of whether the trial court erred and, if so, whether its error was reversible.

Because the majority do not resolve either question correctly, I cannot join in their opinion.

### I

By information filed in the Superior Court of Los Angeles County on behalf of the People, the district attorney charged that appellant Scott Breverman murdered Andreas Suryaatmadja—to quote, Breverman "did willfully, unlawfully, and with malice aforethought murder . . . Suryaatmadja, a human being"—and alleged that he did so by personally using a firearm.

Trial was by jury. In essence, the evidence showed that, one night, Breverman, a White man, was visited at this house in Chatsworth by some friends; although his own role was unclear, it was indeed clear that about eight of his friends set upon Hyun Kim and Yoon Ju, two teenage Asian-American boys, as they were walking past his house; claiming affiliation with a local street gang, they called Kim and Ju "Chinks," "Nips," and other racial slurs, beat them with fists and feet and weapons, and finally let them

go; the next night, Kim returned to challenge his assailants to a fair fight, and brought along seven or eight of his friends, who were also teenage Asian-American boys, to back him up; his friends included Suryaatmadja, who was sixteen years old; finding no one in front of the house, Kim slashed one of the tires of a silver-blue BMW automobile parked in the driveway, which happened to belong to Breverman; he and his friends began to withdraw; Breverman came out of the house to check the vehicle; Kim and his friends sharply challenged Breverman to bring his friends out for a fair fight; Breverman activated the vehicle's alarm system, and went back into the house; Kim and his friends then left; some minutes later they returned, intent on vandalizing the vehicle; although Suryaatmadja and some of the other boys apparently hung back, the rest, with hostile shouts, started battering the vehicle with various instruments; the alarm sounded; from within the house, Breverman commenced firing at Kim and his friends, using a 9-millimeter semiautomatic pistol that was not lawfully registered, shooting off four rounds; the boys fled; leaving the house, and drawing near to the vehicle, he continued firing, with his arm in a level, locked position, parallel to the ground, and finally stopped, shooting off an additional ten rounds all told; in the process, he apparently reloaded the weapon, since he shot off more rounds than its magazine could hold, and still had two remaining, one in the magazine and one in the chamber; about one-hundred and eighty-two feet away, Suryaatmadja lay mortally wounded, shot through the head.

The superior court ruled that the evidence was insufficient for first degree murder, which requires the unlawful killing of a human being with malice aforethought plus premeditation and deliberation. It proceeded to instruct the jury on murder, including second degree murder, which requires only an unlawful killing with malice aforethought. It also instructed on manslaughter, purportedly as a lesser offense necessarily included within the greater charged offense of murder, including voluntary manslaughter. In doing so, it instructed on voluntary manslaughter via the doctrine of "imperfect self-defense," but not, in statutory terms, "upon a sudden quarrel or heat of passion" (Pen. Code, § 192, subd. (a)). It instructed as well on personal use of a firearm.

The jury returned a verdict finding Breverman guilty of second degree murder, and also finding that he personally used a firearm therein.

The superior court rendered judgment accordingly, sentencing Breverman to prison for 18 years to life—15 years to life for second degree murder, plus 3 years for personal use of a firearm.

The Court of Appeal reversed. All of the justices concluded that the superior court erred by failing to instruct the jury on voluntary manslaughter

on a sudden quarrel or heat of passion in addition to voluntary manslaughter via imperfect self-defense, reasoning in effect that manslaughter was a lesser offense necessarily included within the greater charged offense of murder; they also concluded that the error was, as such an error generally is, "reversible per se" under *People* v. *Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913]. One of the justices wrote separately to urge our reconsideration of decisions bearing on each question.

## II

The majority initially conclude that the superior court erred under California law by failing to instruct the jury on voluntary manslaughter on a sudden quarrel or heat of passion in addition to voluntary manslaughter via imperfect self-defense. In so concluding, their major premise is that a trial court must instruct sua sponte on a lesser offense necessarily included within a greater, charged offense. Their minor premise is that manslaughter is a lesser offense necessarily included within the greater charged offense of murder. We need not consider whether the major premise is sound. (But see dis. opn. of Brown, J., *post*, at pp. 195-202.) That is because the minor premise is not.

It was only relatively recently that we adopted the rule that a trial court must instruct the jury sua sponte on a lesser offense necessarily included within a greater charged offense. (*People* v. *Hood* (1969) 1 Cal.3d 444, 449-450 [82 Cal.Rptr. 618, 462 P.2d 370].) Traditionally, a court was not required to give such an instruction. (5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Trial, § 2926, p. 3587; see *People* v. *Hood, supra*, 1 Cal.3d at p. 450 [citing decisions]; *People* v. *Cooper* (1968) 268 Cal.App.2d 34, 36-37 [73 Cal.Rptr. 608] [same]; *People* v. *Roth* (1964) 228 Cal.App.2d 522, 528-529 & fn. 2 [39 Cal.Rptr. 582] [same].)

The purpose of the rule is prophylactic, specifically, to avoid the harm of "over-conviction" and "over-acquittal." (See, e.g., *People* v. *Barton* (1995) 12 Cal.4th 186, 195 [47 Cal.Rptr.2d 569, 906 P.2d 531].) That is to say, it aims to prevent the jury from finding the defendant guilty of a greater offense, even though he is guilty only of a lesser one, out of a desire to keep him from going unpunished. (See, e.g., *ibid.*) At the same time, it aims to prevent the jury from finding the defendant not guilty of a greater offense and letting him go unpunished, even though he is, in fact, guilty of a lesser one. (See, e.g., *ibid.*)

By its very terms, however, the rule is limited. A trial court must instruct sua sponte when, and only when, the lesser offense is *necessarily included*

within the greater charged offense. Two standards are applicable. (E.g., *People* v. *Wolcott* (1983) 34 Cal.3d 92, 98 [192 Cal.Rptr. 748, 665 P.2d 520]; *People* v. *Wright* (1996) 52 Cal.App.4th 203, 208 [59 Cal.Rptr.2d 316].) Under the so-called "legal elements" test (*People* v. *Wright, supra*, 52 Cal.App.4th at p. 208), the lesser is necessarily included within the greater if, *as a matter of law in view of their respective statutory definitions*, an actor cannot commit the greater without necessarily committing the lesser (*People* v. *Wolcott, supra*, 34 Cal.3d at p. 98; *People* v. *Wright, supra*, 52 Cal.App.4th at p. 208). Under the so-called "accusatory pleading" test (*People* v. *Wright, supra*, 52 Cal.App.4th at p. 208), the lesser is necessarily included within the greater if, *as a matter of fact in view of the allegations describing his conduct*, an actor cannot commit the greater without necessarily committing the lesser (*People* v. *Wolcott, supra*, 34 Cal.3d at p. 98; *People* v. *Wright, supra*, 52 Cal.App.4th at p. 208).

Under neither the legal elements test nor the accusatory pleading test is the lesser offense of manslaughter necessarily included within the greater charged offense of murder.

Originally, murder was defined by statute as the "unlawful killing of a human being, with malice aforethought." (Pen. Code, § 187 (1872).) For its part, manslaughter was similarly defined as the "unlawful killing of a human being, without malice." (*Id.*, § 192 (1872).)

In 1970, murder was expanded in its statutory definition to include the "unlawful killing of a human being, *or a fetus*, with malice aforethought." (Pen. Code, § 187, subd. (a), as amended by Stats. 1970, ch. 1311, § 1, p. 2440, italics added.)

Neither in that year nor thereafter was manslaughter expanded in its statutory definition to include the unlawful killing *of a fetus* without malice aforethought. Indeed, just months ago, we held that manslaughter *excluded* a fetus as a victim. (*People* v. *Dennis* (1998) 17 Cal.4th 468, 505-506 [71 Cal.Rptr.2d 680, 950 P.2d 1035].)

Moreover, even though murder is statutorily defined as an unlawful killing *with* malice aforethought and manslaughter is similarly defined as an unlawful killing *without* malice aforethought, as currently understood (see, e.g., *People* v. *Barton, supra*, 12 Cal.4th at pp. 199-201), they are not distinguished simply by their contradictory prepositions. True, it appears that murder is marked by the presence of malice aforethought, and manslaughter by its absence. But the "absence" of malice aforethought in manslaughter is not, strictly speaking, the *absence* of malice aforethought but rather the

presence of other, extrinsic "circumstances" (*id.* at p. 199), specifically, for voluntary manslaughter, a sudden quarrel or heat of passion or imperfect self-defense (*ibid.*; see maj. opn., *ante*, at p. 153; see generally, dis. opn. of Kennard, J., *post*, at pp. 188-189; see also *id.* at p. 189, fn. 4 [stating that "voluntary manslaughter might be termed a lesser *including* offense of murder" (original italics)]).

Under the legal elements test, the lesser offense of manslaughter is *not* necessarily included within the greater charged offense of murder. That is because, as a matter of law in view of their respective statutory definitions, an actor can indeed commit murder without necessarily committing manslaughter. Put otherwise: It is *not* the case that an actor cannot commit murder without necessarily committing manslaughter. Such a person can assuredly commit murder under circumstances devoid of sudden quarrel or heat of passion or imperfect self-defense. He can also do so against a fetus. If he commits murder under such circumstances or against such a victim, it does not follow that he necessarily commits manslaughter. To the contrary, it follows that he necessarily does *not* do so.

Likewise, under the accusatory pleading test, the lesser offense of manslaughter is *not* necessarily included within the greater charged offense ·of murder. That is because, as a matter of fact in view of the allegations describing his conduct, an actor can indeed commit murder without necessarily committing manslaughter. In pertinent part, the information filed below charged only that Breverman "did willfully, unlawfully, and with malice aforethought murder . . . Suryaatmadja, a human being." It is *not* the case that an actor who so conducts himself cannot commit murder without necessarily committing manslaughter. Quite the opposite. Such a person commits murder under circumstances devoid of sudden quarrel or heat of passion or imperfect self-defense. It follows that he necessarily does *not* commit manslaughter. Contrary to the majority's implication (see maj. opn., *ante*, at p. 154, fn. 5), it matters not that his victim is identified as a human being rather than a fetus. To repeat: He commits murder under circumstances devoid of sudden quarrel or heat of passion or imperfect self-defense.

All this is not to deny that manslaughter, as currently understood, is a lesser offense *related to* the greater charged offense of murder. But this very day, in *People* v. *Birks* (1998) 19 Cal.4th 108 [77 Cal.Rptr.2d 848, 960 P.2d 1073], we hold that a trial court need not instruct on lesser related offenses even at the defendant's request, and indeed generally may not do so. If we

are to qualify that holding, we should do so deliberately. The majority do not even make an attempt.[1]

## III

The majority then conclude that the superior court may have erred reversibly under California law by failing to instruct the jury on voluntary manslaughter on a sudden quarrel or heat of passion in addition to voluntary manslaughter via imperfect self-defense.

I disagree.

My first reason is this: The superior court did not err at all, reversibly or otherwise.

My second reason is different. It is suggested in the majority's analysis, but is not developed therein. It follows.

In addressing the question of reversibility, we consider, as a general matter, whether or not the error caused *prejudice*, which is simply a taint on the trial in the form of an unfavorable effect on the outcome, meaning, in a jury trial, an unfavorable effect on the verdict.

To consider prejudice, we first choose the appropriate *standard*—such as the "harmless-beyond-a-reasonable-doubt" test (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]), which generally applies to error violative of the United States

---

[1] I note in passing that, by instructing on voluntary manslaughter via imperfect self-defense, the superior court effectively instructed on voluntary manslaughter on a sudden quarrel or heat of passion. Common to both was Breverman's reaction to Kim and his friends, including Suryaatmadja. Voluntary manslaughter on a sudden quarrel or heat of passion requires provocation that is adequate to arouse a reasonable person. (E.g., *People* v. *Valentine* (1946) 28 Cal.2d 121, 136-144 [169 P.2d 1].) So aroused, such a person may act in terror (e.g., *People* v. *Logan* (1917) 175 Cal. 45, 49 [164 P. 1121]), but not for revenge (e.g., *ibid.*)—not even against teenage boys of a different ethnic group who vandalize his expensive automobile. Here, Breverman's emotions doubtless ran high. But even if they began in terror, they evidently ended in revenge, as he shot off his last rounds, standing near his BMW, with his arm in a level, locked position, parallel to the ground. The same evidence that assertedly supported voluntary manslaughter via imperfect self-defense assertedly supported voluntary manslaughter on a sudden quarrel or heat of passion. That evidence, of course, was rejected by the jury, not at all unreasonably.

Unlike Justice Kennard, I decline to consider, in detail and in depth, the relationship between murder and manslaughter and their respective statutory definitions. I do so because the parties did not raise the issue in the Court of Appeal. (See Cal. Rules of Court, rule 29(b)(1).) The question is surely an important one. But it will not escape examination. It is implicated in *People* v. *Lee*, review granted May 21, 1997 (S060352), which is currently pending on review.*

*Reporter's Note: For Supreme Court opinion see 20 Cal.4th 47.

Constitution; the "reasonable-probability" test (*People* v. *Watson* (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243]), which usually covers error under California law; and the "reasonable-possibility" test (*People* v. *Brown* (1988) 46 Cal.3d 432, 446-448 [250 Cal.Rptr. 604, 758 P.2d 1135]), which covers error under California law bearing on the penalty of death.

Having chosen the appropriate standard, we then ask the ultimate question of prejudice itself, using, in effect, one of two verbal formulas. We sometimes inquire—as do the majority at one point in their opinion (see maj. opn., *ante*, at p. 177)—whether, under the standard in question, the error had an unfavorable effect on the outcome. (See, e.g., *People* v. *Alvarez* (1996) 14 Cal.4th 155, 234 [58 Cal.Rptr.2d 385, 926 P.2d 365] [under reasonable-possibility test]; *People* v. *Marshall* (1996) 13 Cal.4th 799, 851-852 [55 Cal.Rptr.2d 347, 919 P.2d 1280] [under harmless-beyond-a-reasonable-doubt test]; *People* v. *Gordon* (1990) 50 Cal.3d 1223, 1253 [270 Cal.Rptr. 451, 792 P.2d 251] [under reasonable-probability standard]; cf. *People* v. *Alvarez, supra,* 14 Cal.4th at pp. 239, 241, fn. 38 [under reasonable-probability standard for prejudice component of ineffective assistance of counsel violative of United States Constitution, Amendment VI, and California Constitution, article I, section 15].) At other times, we inquire—as do the majority at another point in their opinion (see maj. opn., *ante*, at p. 178)— whether, under the standard in question, a more favorable outcome would have resulted in the absence of the error. (See, e.g., *People* v. *Bradford* (1997) 14 Cal.4th 1005, 1061 [60 Cal.Rptr.2d 225, 929 P.2d 544] [under harmless-beyond-a-reasonable-doubt test]; *People* v. *Jackson* (1996) 13 Cal.4th 1164, 1211 [56 Cal.Rptr.2d 49, 920 P.2d 1254] [under reasonable-probability test]; *People* v. *Wader* (1993) 5 Cal.4th 610, 666 [20 Cal.Rptr.2d 788, 854 P.2d 80] [under reasonable-possibility test]; cf. *People* v. *Ledesma* (1987) 43 Cal.3d 171, 217-218 [233 Cal.Rptr. 404, 729 P.2d 839] [under reasonable-probability standard for prejudice component of ineffective assistance of counsel violative of United States Constitution, Amendment VI, and California Constitution, article I, section 15].)

Whether we use one or the other of the two verbal formulas is a matter of rhetorical style and makes no substantial difference—so long as we focus on the fact that prejudice is an unfavorable effect on the outcome. When we so focus, we recognize a truth that is deceptively simple: Reversal is required if the error caused prejudice, that is, an unfavorable effect on the outcome. Reversal, however, is *not* required merely if the absence of error would have resulted in a more favorable outcome. In the former situation, there is a taint on the trial. In the latter, there is not.

Turning to the case at bar, I believe that, even if the superior court had erred by failing to instruct on voluntary manslaughter on a sudden quarrel or

heat of passion in addition to voluntary manslaughter via imperfect self-defense, its "error" could not have been reversible. The "error" could not have caused prejudice. That is because it could not have caused an unfavorable effect on the verdict. It could only have affected a verdict finding Breverman guilty of voluntary manslaughter—which was not returned by the jury. It could not have affected the verdict finding him guilty of second degree murder—which was.

As I have explained, the purpose of the rule requiring a trial court to instruct sua sponte on a lesser offense necessarily included within a greater charged offense is to avoid the harm of "over-conviction" and "over-acquittal." Even if the rule had been applicable here, its purpose would not have been frustrated. Breverman was obviously not "over-acquitted" by the jury. Indeed, he was not acquitted by it at all. Neither was he "over-convicted." Certainly, the evidence of second degree murder was more than sufficient to support its verdict under the due process clauses of the Fourteenth Amendment to the United States Constitution and article I, section 15 of the California Constitution. Viewing the evidence in the light most favorable to the People, a rational jury could surely have found all that it had to find beyond a reasonable doubt, namely, that Breverman unlawfully killed Suryaatmadja with malice aforethought. (See, e.g., *People* v. *Rowland* (1992) 4 Cal.4th 238, 269 [14 Cal.Rptr.2d 377, 841 P.2d 897].)

In sum, and unlike the majority (see maj. opn., *ante*, at p. 178, fn. 25), I am compelled to conclude that the jury's verdict finding Breverman guilty of second degree murder—a verdict that was returned after an untainted trial, and that was supported by more than sufficient evidence—did not, and could not, amount to, or reflect, a "miscarriage of justice," either under article VI, section 13 of the California Constitution or otherwise.[2]

## IV

For the reasons stated above, I would reverse the judgment of the Court of Appeal and remand the cause to that court *without directions to reconsider the question of reversibility.*

---

[2]Against my conclusion, it might be argued that a trial court's error in failing to instruct on a lesser offense necessarily included within a greater charged offense would be "*non*reversible per se" whenever the jury does not "over-convict" or "over-acquit." But if the harm that such a failure threatens, which is, of course, "over-conviction" and "over-acquittal," does not come to pass, there is no ground for reversal. In this situation, the trial court, by failing to instruct as indicated above, may have failed to provide prophylaxis—but prophylaxis proved not to be necessary.

Unlike Justice Kennard, I decline to consider, in any way, the relationship between murder and manslaughter and its consequences under the United States Constitution. I do so because the parties did not raise the issue in the Court of Appeal. (See, *ante*, at p. 184, fn. 1.)

**KENNARD, J.,** Dissenting.—In California, murder is defined as "the unlawful killing of a human being, . . . with malice aforethought." (Pen. Code, § 187.) One who intentionally kills in the "heat of passion," however, lacks malice and is guilty not of murder, but of voluntary manslaughter. (Pen. Code, § 192.)

In this case, defendant was charged with murder. At trial, the jury heard evidence tending to show that defendant intentionally killed the victim in the heat of passion. This evidence, if credited by the jury, was sufficient to support a verdict of voluntary manslaughter. The trial court, however, did not instruct the jury that one who kills in the heat of passion lacks malice and is therefore not guilty of murder. The jury convicted defendant of murder.

I agree with the majority that, as a matter of state law, the trial court should have instructed the jury that an intentional killing in the heat of passion is not murder but voluntary manslaughter. I disagree, however, with the majority's conclusion that the trial court's failure to so instruct was not federal constitutional error as well. In my view, when a defendant is charged with murder and there is sufficient evidence to support a conviction for voluntary manslaughter on a "heat of passion" theory, failure to instruct on that theory violates the defendant's federal constitutional rights to a jury trial and to due process of law. This conclusion rests on the unique relationship between murder and voluntary manslaughter, a relationship in which voluntary manslaughter includes all the elemental facts necessary to support a conviction for murder *plus* the additional elemental fact of heat of passion.

## I

A group of young men shouting insults and threats approached defendant in his driveway one night. Defendant retreated inside his house and the men attacked defendant's car with sticks and metal rods. Fearing for his safety, defendant got a gun and fired several shots through the door. The group began to flee. Defendant came outside and continued firing at the fleeing group, shooting and killing one of them.

Defendant was charged with murder.[1] The jury was instructed that murder required proof of an unlawful killing with malice aforethought; it was not instructed that a killing done in the heat of passion lacks malice, making the killing only voluntary manslaughter, not murder.

The Court of Appeal reversed defendant's conviction. It held that the trial court's failure to instruct on its own initiative on voluntary manslaughter by reason of heat of passion was reversible error under state law.

---

[1]References to "murder" are to murder in the second degree.

## II

I begin my analysis with a description of the unique relationship between murder and voluntary manslaughter, followed by an analysis of the federal constitutional consequences of that relationship.

Murder is defined by statute as an "unlawful killing" with "malice aforethought." (Pen. Code, § 187, subd. (a.).)[2] Voluntary manslaughter, on the other hand, is an "unlawful killing" "without malice" and "upon a sudden quarrel or heat of passion"[3] (§ 192), or upon a good faith but unreasonable belief in the need for self-defense (*People* v. *Barton* (1995) 12 Cal.4th 186, 199 [47 Cal.Rptr.2d 569, 906 P.2d 531]).

For purposes of murder, malice may be express or implied. "It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188.) Malice is the intent to kill (express malice) or intent to do an act dangerous to human life with conscious disregard of its danger (implied malice); accordingly, murder is proven by showing an unlawful killing plus either the intent to kill or the intent to do a dangerous act with conscious disregard of its danger. (*People* v. *Saille* (1991) 54 Cal.3d 1103, 1114 [2 Cal.Rptr.2d 364, 820 P.2d 588] ["express malice and an intent unlawfully to kill are one and the same"], 1115; *People* v. *Swain* (1996) 12 Cal.4th 593, 601-603 [49 Cal.Rptr.2d 390, 909 P.2d 994].)

When an unlawful killing that would otherwise be a murder is done in the heat of passion, malice is absent and the killing is only a voluntary manslaughter. To establish the absence of malice, however, it is not *necessary* to prove the absence of the mental states used to define malice—the intent to kill or the intent to do an act dangerous to human life with conscious disregard of its danger. Although the absence of malice may be shown in this way, it may also be shown by proving an *additional* elemental fact: that the defendant, even though intending to kill, acted in the heat of passion. "[W]hen the intentional killing results from a sudden quarrel or heat of passion induced by adequate provocation," the killer lacks malice and the only crime committed is voluntary manslaughter. (*People* v. *Saille, supra*, 54 Cal.3d at p. 1114.) The presence of heat of passion establishes the absence of malice even when one of the mental states necessary for murder is present.

Thus, as a functional matter, the elemental facts proving the crime with the greater punishment—murder—are a subset of the elemental facts of the

---

[2] Further statutory references are to the Penal Code.

[3] I use the term "heat of passion" to refer to the statutory language "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).)

crime with the lesser punishment—voluntary manslaughter. Proof of the elemental facts of the crime of murder plus proof of an additional elemental fact (heat of passion) establishes the crime of voluntary manslaughter.

The relationship between murder and voluntary manslaughter is unlike the relationship between the typical greater offense and lesser included offense, in which the elemental facts of the greater offense encompass all of the elemental facts of the lesser offense. Here, the relationship is reversed, and the elemental facts of the *lesser* crime of voluntary manslaughter encompass the elemental facts of the greater crime of murder.[4]

What are the federal constitutional consequences of this unique relationship between murder and voluntary manslaughter?

The federal Constitution guarantees a defendant the right to have the jury decide the existence of all of the elements of the offense of which he is convicted. As I recently explained: "The Sixth Amendment to the federal Constitution 'gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged.' (*United States* v. *Gaudin* (1995) 515 U.S. 506, 522-523 [115 S.Ct. 2310, 132 L.Ed.2d 444].) The jury's 'constitutional responsibility,' the high court said in *Gaudin,* includes applying the law to the facts to determine the existence of each element of the crime—'that is, [the] "ultimate" or "elemental" fact[s]' needed to convict. (*Id.* at pp. 514-515.)" (*People* v. *Flood* (1998) 18 Cal.4th 470, 548 [76 Cal.Rptr.2d 180, 957 P.2d 869] (dis. opn. of Kennard, J.); see also *id.* at p. 491 (maj. opn.).)

In order to make a finding on each elemental fact needed to convict, the jury must of course be fully instructed on the elements of the crime. For that reason, instructions that omit or misdescribe an element of the offense, preventing the jury from making a necessary factual finding, are constitutionally defective. (*People* v. *Flood, supra,* 18 Cal.4th 470, 491 ["The prohibition against directed verdicts for the prosecution extends to instructions that effectively prevent the jury from finding that the prosecution failed to prove a particular element of the crime beyond a reasonable doubt."].) Given the manner in which California has structured the relationship between murder and voluntary manslaughter, the complete definition of malice is *the intent to kill or the intent to do a dangerous act with conscious disregard of its danger plus the absence of* both heat of passion and unreasonable self-defense. Where, as here, there is sufficient evidence of heat of

---

[4]Indeed, voluntary manslaughter might be termed a lesser *including* offense of murder, for although it carries a lesser penalty than murder, it includes all of the elemental facts of murder.

passion to support a voluntary manslaughter verdict, murder instructions that fail to inform the jury it may not find the defendant guilty of murder if heat of passion is present are incomplete instructions on the element of malice.[5]

The United States Supreme Court's decision in *Mullaney* v. *Wilbur* (1975) 421 U.S. 684 [95 S.Ct. 1881, 44 L.Ed.2d 508] supports this conclusion. At issue there was Maine's law of murder and manslaughter, which like California's defined murder as an unlawful killing with malice aforethought, defined malice as an intentional killing in the absence of provocation, and defined manslaughter as an intentional killing without malice. (*Id.* at pp. 684-687, 696-698, 703 [95 S.Ct. at pp. 1882-1884, 1888-1889, 1892].) As in California, murder and manslaughter in Maine were composed of common elemental facts (*id.* at p. 685 [95 S.Ct. at p. 1883]) except for manslaughter's additional elemental fact of "heat of passion on sudden provocation" (*id.* at p. 703 [95 S.Ct. at p. 1892]). One requirement of due process is that the state has the burden of proving beyond a reasonable doubt every elemental fact necessary to establish the offense. (*Id.* at p. 685 [95 S.Ct. at p. 1883].) Maine, however, sought to put upon the defendant the burden of proving the *presence* of heat of passion. Declaring that what mattered was "substance rather than . . . formalism" (*id.* at p. 699 [95 S.Ct. at p. 1890]), the high court concluded that, given the relationship Maine had structured between murder and manslaughter, due process required the state to treat the *absence* of heat of passion as part of the definition of murder and to assume the burden of proving that the defendant did not act in the heat of passion, just as the state must prove every other element of the crime. (*Id.* at pp. 698, 704 [95 S.Ct. at pp. 1889, 1892].) Similarly, here the absence of heat of passion must be treated as part of the definition of murder for jury instruction purposes.

Another avenue of federal constitutional analysis also leads to this conclusion. Due process requires fundamental fairness in the criminal procedures by which a defendant is convicted of a crime. (*United States* v. *Valenzuela-Bernal* (1982) 458 U.S. 858, 872 [102 S.Ct. 3440, 3449, 73 L.Ed.2d 1193] ["Due process guarantees that a criminal defendant will be treated with 'that fundamental fairness essential to the very concept of justice.' "]; *Spencer* v. *Texas* (1967) 385 U.S. 554, 563-564 [87 S.Ct. 648, 653, 17 L.Ed.2d 606] ["the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial"]; *People* v. *Quartermain* (1997) 16 Cal.4th 600, 618 [66 Cal.Rptr.2d 609, 941 P.2d 788].) In particular, due process "ensure[s] fundamental fairness in the determination of guilt at trial." (*Albright* v. *Oliver* (1994) 510 U.S. 266, 283 [114 S.Ct. 807, 818, 127 L.Ed.2d 114] (conc. opn. of Kennedy, J.).)

---

[5]Here, the trial court did correctly instruct the jury on the unreasonable self-defense form of voluntary manslaughter.

As I have noted above, the relationship between murder and voluntary manslaughter is unique. The presence of heat of passion is consistent with the mental state and other facts that would support a murder verdict, but nonetheless heat of passion precludes a murder verdict. If a state has chosen to structure its crimes in this fashion, such that if the jury finds facts X plus Y it is a different crime with a greater punishment than if the jury finds facts X plus Y plus Z, it is fundamentally unfair (at least when there is evidence of Z in the record) not to inform the jury that if Z is present it may not convict the defendant of the greater crime. That is, the state cannot omit an instruction on voluntary manslaughter and thereby prevent the jury from determining the additional circumstance of heat of passion that would make the defendant factually innocent of murder; the defendant has a right to have the jury decide whether that additional circumstance, which is entirely consistent with the facts necessary to convict the defendant of murder, is present.

To omit the instruction creates the very real possibility that the defendant will be convicted of an offense of which, in the jury's view, he is factually innocent under the evidence presented at trial, and it is hard to imagine anything more fundamentally unfair than that. It is manifestly unjust to permit the state to use the jury's ignorance of the elements of voluntary manslaughter to convict a defendant of murder when the jury, had it known of voluntary manslaughter, could have found the additional circumstance of heat of passion that would have instead made the defendant liable only for that lesser crime. Such a procedure fails to ensure fundamental fairness in the determination of guilt at trial. The crucial consideration is that the presence of heat of passion is an additional circumstance, consistent with the elemental facts required to support a murder verdict, that not only establishes liability for voluntary manslaughter but precludes liability for murder.

### III

Before analyzing whether the federal constitutional error in failing to instruct the jury that a killing lacks malice when it occurs in the heat of passion was harmless in this case, I address the majority's conclusion that the issue has not been raised by the parties. (Maj. opn., *ante*, at p. 170, fn. 19.) The majority is mistaken. In their opening brief, the People, who are the petitioners here, correctly recognized that the issue is before this court and addressed it at length. Over the course of 20 pages they discussed the possibility that we would conclude the error here was the misdescription of an element of the offense of murder. They acknowledged in the following words that if the error here amounted to a misdescription of the elements of murder, it would be a federal constitutional error subject to harmless error

analysis under *Chapman* v. *California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]: "Where the omission of an instruction on an applicable lesser included offense results in misinstruction on an element of the greater conviction offense, the standard of harmless error pronounced in *Chapman* v. *California* should apply." "[I]f this Court determines that there was error in this case which resulted in the misinstruction on an element of the greater substantive offense, respondent submits this Court should address what harmless error standard applies where the omitted lesser included offense instructions do not modify the elements of the substantive offense for which the defendant was convicted." The People further argued that, even if the trial court's failure to instruct the jury that a killing in the heat of passion lacks malice and is only voluntary manslaughter amounts to a misdescription of an element of murder that is subject to federal constitutional harmless error review, this conclusion should not carry over to run-of-the-mill failures to instruct on lesser included offenses for crimes other than murder and manslaughter. In the People's words: "Even if this Court concludes that, in this case, the trial court's omission of instructions on the heat of passion theory of voluntary manslaughter resulted in the misinstruction on the element of malice for second degree murder, such a finding would not necessarily apply in other lesser included offense contexts."

Defendant addressed this issue in his answering brief. He asserted that the failure to instruct the jury that a killing in the heat of passion lacks malice and is at most voluntary manslaughter violated his federal constitutional rights to due process and to a jury trial "and the requirement that prosecution prove each fact necessary to constitute the crime charged beyond a reasonable doubt (Fourteenth Amendment [to the federal Constitution])." Defendant specifically relied on *United States* v. *Gaudin* (1995) 515 U.S. 506 [115 S.Ct. 2310, 132 L.Ed.2d 444], a case underpinning my analysis above. He stated: "The Fifth and Sixth Amendment guarantee a jury trial and proof beyond a reasonable doubt as to each element of a criminal offense. . . . Reversal is therefore compelled where there is a failure to instruct on any component element of a crime." He continued: "In this case, the failure to instruct on heat of passion manslaughter effectively omitted an element of the offense and removed the issue of provocation negating malice from the jury."[6] It is hard to imagine a more succinct statement of the issue. Defendant then correctly explained that under controlling United States Supreme

---

[6]Defendant's claim that the trial court unconstitutionally "removed the issue of provocation negating malice from the jury" is a claim that the jury convicted him of murder without being fully instructed on the statutory element of malice. The majority, however, denies that defendant has presented this claim, concluding that the word "offense" in the sentence from defendant's brief quoted in the text refers to voluntary manslaughter, not murder, and that defendant is only complaining of incomplete instructions on voluntary manslaughter. (Maj.

Court precedent (which I discuss and rely on below) the failure to completely instruct on the elements of the offense of which defendant is convicted cannot be cured by subsequent factfinding by a judge rather than a jury: "The United States Supreme Court is clear that a verdict rendered in the absence of jury instructions and findings regarding the component elements of the charge is irremediably defective because [a] post-verdict fact-finder attempting to correct the deficiency would be 'the wrong entity.' "

Nor is it surprising that neither party raised the issue in the Court of Appeal. At that stage, the case was controlled by the well-established state law precedent of *People* v. *Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913] and its progeny. It would be pointless to require that a party entitled to prevail under settled state law announced long ago by this court must present to the Court of Appeal every conceivable alternative federal constitutional ground in support of its position on the purely hypothetical possibility that we will later grant the opposing party's petition to review the case, discard our settled precedent, and rule against the prevailing party on the state law question. To do so would impose a purposeless burden on both the parties and the Courts of Appeal, for the Court of Appeal in such a case would, after wasting its time reading those arguments, invariably ignore them in adhering to and applying the settled law of this court. For a similar reason, the People in this case did not raise in the Court of Appeal the issue the majority decides—whether the standard of harmless error review this court announced in *Sedeno* should be changed. To do so would have been equally pointless, given the Court of Appeal's inevitable adherence to *Sedeno*.

We have never required perfection in briefing as the price of recognizing a defendant's constitutional rights. Defendant, the responding party in this court defending a favorable judgment by the Court of Appeal decided solely on state law grounds, more than adequately raised the issue of whether failing to instruct on heat of passion was federal constitutional error resulting in incomplete instructions on the elements of murder. Even though the majority remands the case for further proceedings, it remains a grave

opn., *ante*, at p. 169, fn. 18.) This conclusion is erroneous and illogical, for the offense defendant refers to can only be murder, the offense of which he was convicted, and not voluntary manslaughter, an offense of which he was not convicted. The danger posed by jury instructions *omitting* an element of the offense is that the defendant will be unjustly convicted of an offense without the jury finding that all its elements are present. Defendants thus can be harmed by instructions omitting an element of an offense only if they are convicted of the offense. Because omitting an element of an offense of which a defendant has not been convicted (in this case, manslaughter) cannot harm the defendant, the majority's alteration turns defendant's sentence into nonsense.

injustice for this court to refuse to recognize defendant's claim and deny him his constitutional rights.

## IV

Having concluded that the failure to give instructions on heat of passion was federal constitutional error, I now turn to the question of whether the error was harmless. Instructions omitting or misdescribing an element of an offense are subject to harmless error analysis under the test of *Chapman* v. *California, supra,* 386 U.S. 18, as applied in *Sullivan* v. *Louisiana* (1993) 508 U.S. 275 [113 S.Ct. 2078, 124 L.Ed.2d 182]. (*People* v. *Flood, supra,* 18 Cal.4th 470, 503-507; accord, *id.* at p. 548 (dis. opn. of Kennard, J.).) The essential inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Sullivan* v. *Louisiana, supra,* 508 U.S. 275, 279 [113 S.Ct. 2078, 2081], original italics.)

The three most common circumstances in which it may be concluded that the verdict is "surely unattributable to the error" are (1) when the jury has necessarily resolved the omitted factual question under other properly given instructions, (2) when some factual finding the jury has made is the functional equivalent of a finding on the omitted factual question (because no rational jury could find the fact actually found without also finding the omitted fact), and (3) when the defendant admitted or affirmatively conceded the omitted factual question. (*People* v. *Flood, supra,* 18 Cal.4th 470, 504-507; *id.* at pp. 548, 550-554 (dis. opn. of Kennard, J.).) None of these circumstances is present here. The jury did not resolve the question of whether defendant acted in the heat of passion under any of the instructions given, nor did the jury decide any question that was the functional equivalent of deciding whether defendant acted under the heat of passion. Defendant did not admit or affirmatively concede that he had not acted in the heat of passion.

The omission of an instruction on voluntary manslaughter by reason of heat of passion was not harmless, and defendant's conviction is therefore unconstitutional.[7]

## CONCLUSION

In this case, the jury that found defendant guilty of murder was never asked to determine whether defendant had acted in the heat of passion and

[7]As I earlier stated, this case turns on the unique relationship between murder and voluntary manslaughter. It presents no occasion to address the question of what standard should be applied in general to determine whether a trial court's failure to instruct sua sponte on a typical lesser included offense is harmless.

therefore lacked malice and was not guilty of murder but only of voluntary manslaughter. There was sufficient evidence to support the conclusion that defendant had acted in the heat of passion. Accordingly, I would affirm the judgment of the Court of Appeal reversing defendant's conviction.

**BROWN, J.,** Dissenting.—

The majority, concluding that the trial court erred in failing to instruct sua sponte on voluntary manslaughter on a heat of passion theory, directs the Court of Appeal to reconsider the prejudicial impact of that error. In my view, the trial court did not err at all, reversibly or otherwise. Therefore, I respectfully dissent.

I

The majority cites *People* v. *Sedeno* (1974) 10 Cal.3d 703, 715-716 [112 Cal.Rptr. 1, 518 P.2d 913] (*Sedeno*), for the proposition that trial courts have a "sua sponte duty to instruct on lesser necessarily included offenses." (Maj. opn., *ante*, at p. 148.) Following today's decision, a proper citation to *Sedeno* for this seemingly straightforward proposition will read as follows: *Sedeno*, *supra*, 10 Cal.3d at pages 715-716, overruled on other grounds in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685 [160 Cal.Rptr. 84, 603 P.2d 1], footnote 12 (abrogating *Sedeno*'s requirement that jury instructions must be given whenever any evidence is presented, no matter how weak) and over-ruled on other grounds in *People* v. *Breverman* (1998) 19 Cal.4th 142, 163, footnote 10 (abrogating *Sedeno*'s characterization of heat of passion as a defense) and overruled on other grounds in *People* v. *Breverman*, *supra*, 19 Cal.4th at pages 164-178 (abrogating *Sedeno*'s standard for determining whether the failure to instruct is prejudicial).[1]

This ought to be our first clue.

The time is long overdue for a critical reexamination of the court's lesser offense jurisprudence. Today, we have commenced this important task, unanimously overruling *People* v. *Geiger* (1984) 35 Cal.3d 510 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055], which addressed lesser *related* offenses. (See *People* v. *Birks* (1998) 19 Cal.4th 108 [77 Cal.Rptr.2d 848, 960 P.2d 1073].) I applaud that decision. I write separately in this case to urge a similar reexamination for lesser *included* offenses.

---

[1]Indeed, *Sedeno* itself overruled an even more stringent standard for determining whether the failure to instruct is prejudicial. (See *Sedeno*, *supra*, 10 Cal.3d at pp. 720-721, overruling *People* v. *Modesto* (1963) 59 Cal.2d 722, 730-731 [31 Cal.Rptr. 225, 382 P.2d 33].) I wonder why, if the sua sponte instruction rule is as important as some of our prior cases seem to say, we have now made the failure to instruct on lesser included offenses all but harmless per se. (See dis. opn. of Mosk, J., *ante*, at p. 186 & fn. 2.)

## II

Throughout its opinion, the majority clings to what little is left of *Sedeno*—namely, its requirement that trial courts must instruct sua sponte on lesser included offenses supported by the evidence. While freely admitting that "[s]everal of the People's arguments . . . attack the heart of the *Sedeno* rule in all its applications" (maj. opn., *ante*, at p. 162, fn. 9) and that "several of their arguments imply a general distaste for the sua sponte instructional rule for lesser included offenses" (*id.* at p. 156, fn. 6), the majority steadfastly resists any serious examination of *Sedeno*'s core analytical underpinnings. Instead, the majority repeatedly seeks refuge in the fact the People have made no contention "that the California rule requiring sua sponte instructions on lesser necessarily included offenses should be entirely abrogated in favor of a rule requiring such instructions only on a party's request." (Maj. opn., *ante*, at p. 156, fn. 6; see also *id.* at pp. 162, fn. 9 ["Of course, as we have previously indicated, the People do not ask that we overrule *Sedeno* per se."]; *id.* at p. 169, fn. 17 ["Finally, we stress again that in this case, the People raise no *general* objection to the *Sedeno* instructional rule, including its sua sponte aspect."].)

As a court of last resort, a court whose role is to provide guidance and workable procedures for our lower courts, we cannot simply cloak ourselves in the doctrine of stare decisis. That doctrine is " ' "a flexible one which permits this court to reconsider, and ultimately to depart from, our own prior precedent in an appropriate case." ' " (*People* v. *Birks, supra,* 19 Cal.4th at p. 117.) " ' "It . . . 'is based on the assumption that certainty, predictability and stability in the law are the major objectives of the legal system . . . .' " ' " (*Id.* at p. 116.) As the "full" citation to *Sedeno* amply demonstrates (see *ante*, at p. 195), these adjectives scarcely describe our lesser included offense jurisprudence, which has been plagued by uncertainty, unpredictability, and instability. " ' " '[A]lthough the doctrine [of stare decisis] does indeed serve important values, it nevertheless should not shield court-created error from correction.' " ' [Citation.]" (*People* v. *Birks, supra,* 19 Cal.4th at p. 117.) This is particularly true where, as here, the error is one of constitutional interpretation, as to which "only we can remedy the mistake. [Citations.]" (*Ibid.*)

As I explain below, *Sedeno*'s sua sponte instruction rule finds no basis whatsoever in our state Constitution. Nor do the "broader interests" identified by the majority (maj. opn., *ante*, at p. 155) warrant its retention. To the contrary, the rule runs counter to the very premises underlying our system of

criminal justice. Under these circumstances, we have *an obligation* to rethink the requirement.[2]

### III

In a single sentence, quoting language found in some of our prior decisions, the majority tepidly observes that "[c]ases have suggested that the requirement of sua sponte instructions arises, among other things, from the defendant's right under the California Constitution 'to have the jury determine every material issue presented by the evidence.' " (Maj. opn., *ante*, at p. 155, citing *People v. Geiger, supra*, 35 Cal.3d at p. 519, *People v. Wickersham* (1982) 32 Cal.3d 307, 335 [185 Cal.Rptr. 436, 650 P.2d 311], *Sedeno, supra*, 10 Cal.3d at p. 720, *People v. Modesto, supra*, 59 Cal.2d at p. 730.) Significantly, all four cases cited by the majority are cases this court has largely repudiated. The lesser related offense instruction rule established in *Geiger, supra*, 35 Cal.3d 510, was overruled in *People v. Birks, supra*, 19 Cal.4th 108. The characterization of unreasonable self-defense as a defense in *People v. Wickersham, supra*, 32 Cal.3d at p. 329, was overruled in *People v. Barton* (1995) 12 Cal.4th 186, 200-201 [47 Cal.Rptr.2d 569, 906 P.2d 531]. This court has overruled *Sedeno, supra*, 10 Cal.3d 703, on three different points. (See *ante*, at pp. 1-2.) And the standard for reversal established in *People v. Modesto, supra*, 59 Cal.2d 722, was overruled in *Sedeno, supra*, 10 Cal.3d 703. (See *ante*, at p. 195, fn. 1.)

Exactly where in our state Constitution the so-called "right" to sua sponte instructions on lesser included offenses is to be found is unclear. In fact, as the majority later acknowledges (see maj. opn., *ante*, at p. 165), the analyses in *Sedeno* and *Modesto* are so cursory that it is not even clear whether we were relying on state or federal constitutional principles; the same is true of *Wickersham*. The fourth case cited by the majority, *People v. Geiger, supra*, 35 Cal.3d at page 519, cryptically describes the right as "an incident of due process under the California Constitution." Once again, however, exactly what it is about our state Constitution's due process clause that requires sua sponte instructions on lesser included offenses remains a mystery.

As the majority grudgingly concedes in a footnote (maj. opn., *ante*, at p. 169, fn. 17), "[a]s early as 1938, we stated that 'cogent reasons must exist

[2]At a bare minimum, we ought not to *extend* the sua sponte instruction rule "to *every theory* of [a lesser included] offense that finds rational support in the evidence." (Maj. opn., *ante*, at p. 148, italics added.) The People's proposal—that trial courts need only instruct sua sponte on the theory of a lesser included offense most consistent with the evidence and the line of defense pursued at trial—is eminently reasonable. Indeed, the United States Supreme Court's decision in *Schad v. Arizona* (1991) 501 U.S. 624 [111 S.Ct. 2491, 115 L.Ed.2d 555], suggests precisely such an approach. (See maj. opn., *ante*, at p. 161, fn. 8.)

before a state court in construing a provision of the state Constitution will depart from the construction placed by the Supreme Court of the United States on a similar provision in the federal Constitution.' [Citations.]" (*Raven* v. *Deukmejian* (1990) 52 Cal.3d 336, 353 [276 Cal.Rptr. 326, 801 P.2d 1077]; see also *American Academy of Pediatrics* v. *Lungren* (1997) 16 Cal.4th 307, 424-427 [66 Cal.Rptr.2d 210, 940 P.2d 797] (dis. opn. of Brown, J.).) The United States Supreme Court's decisions "leave substantial doubt that the federal Constitution confers *any* right to lesser included offense instructions in noncapital cases. They provide no basis whatever for a conclusion that the federal charter would require such instructions . . . *on the court's own motion.*" (Maj. opn., *ante*, at p. 168, original italics; see also *Kubat* v. *Thieret* (7th Cir. 1989) 867 F.2d 351, 365-366 ["No federal court has imposed on trial judges a duty to *sua sponte* instruct on lesser included offenses, and we agree with the district court that the wisdom of such a rule would be questionable."].)

The only " 'cogent reason[]' " offered by the majority for departing from the United States Supreme Court's decisions is its bald assertion that "the reasons for the long-established California approach to instructions on lesser included offenses . . . as a matter of state constitutional law . . . have been set forth at length in our decisions."[3] (Maj. opn., *ante*, at p. 169, fn. 17.) Where? I have searched high and low for such an explanation. I challenge the majority to point to exactly where it can be found.

In reality, it does not exist. The lesser included offense instruction rule is a creature of statutory, not constitutional law. Specifically, it is a court-created procedure designed to implement Penal Code section 1159 (section 1159), a statute the majority relegates to a footnote. (Maj. opn., *ante*, at p. 166, fn. 13.) Section 1159, enacted in 1872, provides that "[t]he jury . . . may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense." Section 1159, in turn, was based on an even earlier law, which provided for such instructions *on the request of either party.* (See Stats. 1850, ch. 119, § 392, p. 303; *id.*, § 456, p. 308.) Early decisions of this court interpreting section 1159 consistently held that "a judgment will not be reversed because the trial court had not instructed as to a lesser crime included in the greater one charged, *unless the defendant had requested that the jury be so instructed.*" (*People* v. *Bailey* (1904) 142 Cal. 434, 435 [76 P.

---

[3] In *People* v. *Birks*, *supra*, 19 Cal.4th at p. 124, this court suggests that "stare decisis may provide a ' "cogent reason[]" ' . . . to retain, for California purposes, a constitutional principle once established, even if that principle subsequently appears at odds with federal jurisprudence." I agree, but only to the extent the state rule is itself well grounded. As explained in the text, the California rule requiring trial courts to instruct sua sponte on lesser included offenses does not fall in this category.

49], italics added, citing *People* v. *Wilson* (1902) 135 Cal. 331 [67 P. 322]; *People* v. *Hite* (1901) 135 Cal. 76 [67 P. 57]; *People* v. *Barney* (1896) 114 Cal. 554 [47 P. 41]; *People* v. *McNutt* (1892) 93 Cal. 658 [29 P. 243]; *People* v. *Guidice* (1887) 73 Cal. 226 [15 P. 44]; *People* v. *Franklin* (1886) 70 Cal. 641 [11 P. 797].)

In 1969, in a case that did not cite section 1159 and contained no constitutional analysis whatsoever, this court summarily overturned this extensive body of case law. The sum total of our analysis was as follows: "[T]he cases establishing this general rule [i.e., the duty to instruct on general principles of law relevant to the issues raised by the evidence] are in conflict with another line of cases that hold that it is not error for the court to fail to instruct on lesser included offenses on its own motion, even though such an instruction would be supported by the evidence. (*People* v. *Bailey* (1904) 142 Cal. 434 [76 P. 49]; *People* v. *Hite* (1901) 135 Cal. 76 [67 P. 57]; *People* v. *Franklin* (1886) 70 Cal. 641 [11 P. 797]; *People* v. *Smith* (1963) 223 Cal.App.2d 225, 237 [35 Cal.Rptr. 719]; *People* v. *Calderon* (1957) 155 Cal.App.2d 526, 530 [318 P.2d 498]; *People* v. *Williams* (1956) 141 Cal.App.2d 849, 853 [297 P.2d 759].) We believe that there is no basis for such an exception to the general rule. Accordingly, to the extent that the foregoing cases support a special rule for lesser included offenses, they are overruled." (*People* v. *Hood* (1969) 1 Cal.3d 444, 449-450 [82 Cal.Rptr. 618, 462 P.2d 370]; see also dis. opn. of Mosk, J., *ante*, at p. 181 ["It was only relatively recently that we adopted the rule that a trial court must instruct the jury sua sponte on a lesser offense necessarily included within a greater charged offense. [Citation.] Traditionally, a court was not required to give such an instruction. [Citations.]"].)

And so, through the auspices of judicial alchemy, our "constitutional" right to sua sponte instructions on lesser included offenses was born. And, through similar offices, the majority concludes it ought to be continued. I don't think so.

IV

Apparently recognizing the vacuity of our prior case law on the constitutional issue, the majority hastens to add that "we have consistently stressed the broader interests served by the sua sponte instructional rule. As we have said, insofar as the duty to instruct applies regardless of the parties' requests or objections, it prevents the 'strategy, ignorance, or mistakes' of *either* party from presenting the jury with an 'unwarranted all-or-nothing choice,' encourages 'a verdict . . . no harsher *or more lenient* than the evidence merits' (*Wickersham, supra,* 32 Cal.3d at p. 324, italics added), and thus

protects the jury's 'truth-ascertainment function' (*Barton, supra,* 12 Cal.4th 186, 196). 'These policies reflect concern [not only] for the rights of persons accused of crimes [but also] for the overall administration of justice.' (*Wickersham, supra,* 32 Cal.3d at p. 324.)" (Maj. opn., *ante,* at p. 155.)

This sounds nice. But what does it *mean?* It means we fundamentally distrust the adversary process. Such distrust runs counter to "[t]he very premise of our adversary system of criminal justice[, which] is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." (*Herring* v. *New York* (1975) 422 U.S. 853, 862 [95 S.Ct. 2550, 2555, 45 L.Ed.2d 593]; see also *In re Visciotti* (1996) 14 Cal.4th 325, 363 [58 Cal.Rptr.2d 801, 926 P.2d 987] (dis. opn. of Brown, J.).) "In other words, 'The system *assumes* that adversarial testing will ultimately advance the public interest in truth and fairness.' " (*People* v. *Bloom* (1989) 48 Cal.3d 1194, 1236-1237 [259 Cal.Rptr. 669, 774 P.2d 698] (conc. and dis. opn. of Mosk, J.), quoting *Polk County* v. *Dodson* (1981) 454 U.S. 312, 318 [102 S.Ct. 445, 449-450, 70 L.Ed.2d 509], italics added.) Absent concrete evidence that the adversary process in a given case has, in fact, broken down (see, e.g., *In re Visciotti, supra,* 14 Cal.4th at pp. 362-366 (dis. opn. of Brown, J.)), I decline to indulge in the majority's across-the-board assumption to the contrary.

It is worth noting that at the time our prior cases first articulated the sua sponte instruction rule, there was more of a reason to question the efficacy of the adversary process because the performance of criminal defense counsel was not subjected to the same level of scrutiny as it is today. (See *People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487] [To obtain relief based on ineffective assistance of counsel "[i]t must appear that counsel's lack of diligence or competence reduced the trial to a 'farce or a sham.' [Citations.]"], overruled in *People* v. *Pope* (1979) 23 Cal.3d 412, 421-426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) Now, with heightened scrutiny of defense counsel's performance, both on direct appeal and in habeas corpus proceedings, there is no need for a sua sponte instruction rule to guard against attorney error. Indeed, to continue the requirement serves only to turn our courts into the very " 'gambling halls' " it was designed to close down. (*People* v. *Barton, supra,* 12 Cal.4th at p. 204.) For example, as the People observe, the rule allows a defendant to pursue his strongest line of defense, remain silent about other, potentially inconsistent, defenses supported by the evidence, and then, if unsuccessful on the primary defense, to complain for the first time on appeal. (See *People* v. *Guiuan* (1998) 18 Cal.4th 558, 578 [76 Cal.Rptr.2d 239, 957 P.2d 928] (conc. and dis. opn. of Brown, J.), quoting *People* v. *Prettyman* (1996) 14 Cal.4th 248, 293 [58 Cal.Rptr.2d 827, 926 P.2d 1013] (conc. and dis. opn. of Brown, J.)

[Generally, sua sponte instructions "do[] little to improve the quest for justice in the trial courts while frequently generating an argument for reversal on appeal. [Citation.]"]; cf. *Cowan* v. *Superior Court* (1996) 14 Cal.4th 367, 392 [58 Cal.Rptr.2d 458, 926 P.2d 438] (conc. and dis. opn. of Brown, J.) [permitting a defendant to raise a statute of limitations defense for the first time on appeal "encourage[s] gamesmanship"].) The problem has only been exacerbated by the recent proliferation of lesser offenses and the attendant difficulties in determining what constitutes an "included" offense. (See dis. opn. of Mosk, J., *ante*, at pp. 181-184 [arguing that manslaughter is a lesser *related*, not a lesser *included*, offense of murder]; but see *People* v. *Watson* (1983) 150 Cal.App.3d 313, 321 [198 Cal.Rptr. 26] [chronicling the "firmly established" treatment of manslaughter as a lesser *included* offense of murder].)

Trusting, as I do, our adversary system of criminal justice, I would adopt the federal rule governing instructions on lesser included offenses, which is well summarized in *Walker* v. *United States* (D.C. Cir. 1969) 418 F.2d 1116. "In general the trial judge should withhold charging on [a] lesser included offense unless one of the parties requests it, since that charge is not inevitably required in our trials, but is an issue best resolved, in our adversary system, by permitting counsel to decide on tactics. If counsel ask for a lesser-included-offense instruction, it should be freely given. [Citation.] If it is not requested by counsel, it is properly omitted by the trial judge, and certainly should not be initiated by the judge after summations are completed, except possibly in an extreme case." (*Id.* at p. 1119, fn. omitted.) Such a rule is consistent with this court's early—and, in my view, correct—treatment of the issue. (See *ante*, at p. 199; cf. *People* v. *Birks, supra*, 19 Cal.4th at pp. 124, 126 [Section 1159 is "nearly identical" to rule 31(c) of the Federal Rules of Criminal Procedure (18 U.S.C.), the governing federal rule, and "there is no reason to assume our statute has any different purpose, or any broader meaning, than rule 31(c)" as construed by the United States Supreme Court.].) A request-based rule is also consistent with the result reached in our recent decision in *People* v. *Barton, supra*, 12 Cal.4th 186, where the prosecution requested that the instruction at issue be given.[4] (*Barton, supra*, at p. 193.)

---

[4]Although I agree that the parties' briefs at least implicitly raise the issue addressed in Justice Kennard's dissenting opinion, neither party has addressed, or even cited, *Mullaney* v. *Wilbur* (1975) 421 U.S. 684 [95 S.Ct. 1881, 44 L.Ed.2d 508], the seminal case on the point. Since this court has not ordered supplemental briefing on the issue, I decline to address it in detail. I do note, however, that the United States Supreme Court's decision in *Mullaney, supra*, 421 U.S. 684, grants the states considerable latitude in this area, expressly requiring that the heat of passion issue be "properly presented" (*id.* at p. 704 [95 S.Ct. at p. 1892]) and expressly upholding state law requirements that a defendant present " 'some evidence' " on the issue (*id.* at pp. 701-702, fn. 28 [95 S.Ct. at p. 1891]). It may well be that a heat of passion

V

For the reasons discussed above, I would reverse the judgment of the Court of Appeal and remand this case to that court with directions to address the remaining issues raised by defendant on appeal.

issue is not properly presented for *Mullaney* purposes unless and until a defendant requests instructions on the issue. (Cf. *id.* at p. 704 & fn. * [95 S.Ct. at p. 1892] (conc. opn. of Rehnquist, J.) [noting that the state had not made any point of the defendant's failure to object in the trial court where "making an objection or exception . . . might prevent the error from ever occurring"].)